

IN THE

# Court of Appeals of Indiana

Individual Members of the Medical Licensing Board of Indiana,
in their official capacities, et al.,

*Appellants-Defendants*

v.

Anonymous Plaintiff 1, et al.,

*Appellees-Plaintiffs*



FILED

Apr 04 2024, 9:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

April 4, 2024

Court of Appeals Case No.
22A-PL-2938

Appeal from the Marion Superior Court

The Honorable Heather A. Welch, Judge

Trial Court Cause No.
49D01-2209-PL-31056

---

**Opinion by Judge Weissmann**

Judge May concurs and
Judge Bailey concurs with a separate opinion.

**Weissmann, Judge.**

[1] The Indiana General Assembly passed a law criminalizing most abortions in the summer of 2022. Before the law took effect, five anonymous Indiana women and Hoosier Jews for Choice (collectively, Plaintiffs) challenged the law in a complaint they filed against the Individual Members of the Medical Licensing Board of Indiana and the prosecutors in Marion, Lake, Monroe, St. Joseph, and Tippecanoe counties (collectively, the State).[1] Plaintiffs alleged that the law, now codified as Indiana Code § 16-34-2-1 (Abortion Law), violated their rights under the state's Religious Freedom Restoration Act (RFRA). *See* Indiana Code § 34-13-9-1 *et seq.*

[2] The trial court granted Plaintiffs' request for a preliminary injunction, halting enforcement of the Abortion Law against Plaintiffs until their underlying RFRA claim could be resolved. The State appeals that ruling as well as the trial court's later certification of this case as a class action. The State claims the trial court lacked jurisdiction to enter the preliminary injunction because Hoosier Jews for Choice lacks standing and Plaintiffs' claims are not ripe for

---

[1] Since Plaintiffs filed their Complaint, one of them—Anonymous Plaintiff 3—has been voluntarily dismissed from the case.

adjudication. The State also claims that Plaintiffs failed to prove the requirements for a class action or for a preliminary injunction, and, in any case, the injunction is too broad.

[3] We conclude that Hoosier Jews for Choice has associational standing, that Plaintiffs' claims are ripe, and that the class action certification was not an abuse of discretion. Although we find the trial court did not abuse its discretion in granting injunctive relief, the preliminary injunction is overly broad because it enjoins enforcement of the Abortion Law in ways that do not violate RFRA. We therefore affirm but remand for entry of a narrower injunction.[2]

## Facts

[4] The United States Supreme Court set the stage for this appeal two years ago when it ruled that the federal constitution "does not confer a right to abortion." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 292 (2022) (overruling in part *Roe v. Wade*, 410 U.S. 113 (1973) and *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1993)). In so ruling, the *Dobbs* Court placed the ability to regulate abortions not protected by federal law squarely in the states' laps.

[5] The landmark decision unleashed a torrent of state legislative and judicial activity. Legislatures rushed to enact statutes that incorporated their views on this divisive issue. Just as quickly, individuals and organizations turned to the

---

[2] We conducted oral argument in this matter and thank counsel for their excellent presentations. We also thank the amici curiae which submitted briefs. The quality of the submissions—both oral and written— greatly assisted the Court in deciding this appeal.

courts to challenge legislation that did not subscribe to their views of abortion. The citizens in some states even went to the ballot box to amend their constitutions to protect reproductive freedoms.

[6] Indiana was among the states to act quickly after *Dobbs*. Through the Abortion Law, the General Assembly prohibited abortions except under specified circumstances when: (1) abortion is "necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life"; (2) the pregnancy resulted from rape or incest; or (3) the fetus has a lethal anomaly. Ind. Code § 16-34-2-1.[3]

[7] Before the Abortion Law took effect, Plaintiffs filed their "Class Action Complaint for Declaratory and Injunctive Relief" seeking to halt the Abortion

---

[3] Throughout the course of this case, the parties sometimes have used the term "fetus" to describe all developmental stages of a pregnancy. However, this language deviates from the scientifically accepted language. A zygote is created when the sperm fertilizes the egg. https://my.clevelandclinic.org/health/ articles/7247-fetal-development-stages-of-growth.com, Fetal Development: Week-by-Week Stages of Pregnancy (clevelandclinic.org) [https://perma.cc/G8NX-WRCJ]; *see also* https://www.cdc.gov/art/ reports/2020/glossary.html [https://perma.cc/3UTU-AG67] (defining: (1) "fertilization" as "[t]he penetration of the egg by the sperm and the resulting combining of genetic material that develops into an embryo"; and (2) "zygote" as "[a] fertilized egg before it divides").

Once created, the zygote then divides and becomes an embryo about three weeks later. https://my.cleveland clinic.org/health/articles/7247-fetal-development-stages-of-growth.com, Fetal Development: Week-by-Week Stages of Pregnancy (clevelandclinic.org) [https://perma.cc/XY87-GW4]; *see also* https://www.cdc.gov/art/ reports/2020/glossary.html [https://perma.cc/L57M-SREG] (defining "embryo" as "[a]n egg that has been fertilized by a sperm and has then undergone one or more cell divisions.").

Around eight weeks post-fertilization, a fetus is formed, and the fetal stage of development continues until birth of the human child. https://my.clevelandclinic.org/health/articles/7247-fetal-development-stages-of-growth.com, Fetal Development: Week-by-Week Stages of Pregnancy (clevelandclinic.org) [https://perma. cc/4BW9-7R7W]; https://www.cdc.gov/art/reports/2020/glossary.html [https://perma.cc/GTH5-A4D3] (defining "fetus" as "[t]he unborn offspring from the eighth week after conception to the moment of birth"). We use the term "fetus" when quoting the parties, court decisions, and applicable statutes even if this term seemingly refers to an earlier stage of development. In all other respects, we employ the scientific terms.

Law's application to them. Their Complaint alleged that the Abortion Law violated their state RFRA rights.

[8] Under Indiana's RFRA, "[a] governmental entity may substantially burden a person's exercise of religion only if the governmental entity demonstrates that application of the burden to the person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." Ind. Code § 34-13-9-8(b). Plaintiffs allege that their sincere religious beliefs (or, in the case of Hoosier Jews for Choice, its members' sincere religious beliefs) direct them to seek pregnancy terminations criminalized by the Abortion Law. Plaintiffs further allege that the State has no compelling interest in preventing these religiously motivated health care decisions and, even if a compelling interest exists, the Abortion Law is not the least restrictive means of furthering that interest.

[9] The Anonymous Plaintiffs, as described in their Complaint, are:

- Anonymous Plaintiff 1, who is 39, Jewish, married with one child, and living in Monroe County. She follows a kosher-style diet and is active in her synagogue.

  In accordance with her religion, she believes life begins when a child takes their first breath after birth and that the life of a pregnant woman—including her physical and mental health and wellbeing—"must take precedence over the potential for life embodied in a fetus." Appellants' Prelim. Inj. App. Vol. II, p. 70. She further believes, in accordance with her Jewish faith, that "if her health or wellbeing—physical, mental, or emotional—were endangered by a pregnancy, pregnancy-

related condition, or fetal abnormality, she must terminate the pregnancy." *Id.* at 70-71.

She previously terminated a pregnancy when genetic testing revealed the fetus had a severe chromosomal defect that likely would cause miscarriage, stillbirth, or death within the first year after a live birth. Although Anonymous Plaintiff 1 wishes to have another child, her pregnancy would be considered high risk due to her age, and she would face the risk of the same fetal defect. Due to the Abortion Law, she therefore has refrained from seeking to become pregnant.

- Anonymous Plaintiff 2, who is a 30-year-old Allen County resident not affiliated with any religious organization and who does not believe in a single, theistic god. Married with two children, she instead believes in a "supernatural force or power in the universe that connects all humans" and that "we are endowed with bodily autonomy" that should not be infringed upon. *Id.* at 75.

  Her religious and spiritual beliefs guide her life and dictate that "[i]f a pregnancy or the birth of a child would not allow her to fully realize her humanity and inherent dignity, she would have to terminate her pregnancy . . . even under circumstances which would not be permitted under [the Abortion Law]." *Id.* at 76. She has terminated a pregnancy for that reason and does not believe that life begins at conception. Her "significant anxiety about the possibility of an unintended pregnancy and her inability to terminate such a pregnancy under" the Abortion Law has resulted in a "harmful" reduction in physical intimacy between her husband and her. *Id.*

- Anonymous Plaintiffs 4 and 5, who are a Jewish, same-sex married couple without children, living in Monroe County. Active in their synagogue, they believe in accordance with their faith that "life begins when a child takes [their] first breath after being born" and that "the life of a pregnant

person, including their physical and mental health and wellbeing, takes precedence over the potential for life embodied in a fetus." *Id.* at 81.

Prior to the Abortion Law's enactment, the couple had planned for one of them to become pregnant through "assisted reproductive technologies." *Id.* at 81. They now are refraining from doing so due to the unavailability of a pregnancy termination when their religious beliefs dictate it.

- Certain members of Hoosier Jews for Choice, which is a membership organization aimed at advancing reproductive justice, supporting abortion access, and promoting bodily autonomy for Hoosiers. Its members are Jewish persons who believe that "under Jewish law and religious doctrine, life does not begin at conception, and that a fetus is considered a physical part of the woman's body, not having a life of its own or independent rights." *Id.* at 83.

  Hoosier Jews for Choice's members, some of whom are capable of becoming pregnant, further believe that "under Jewish law an abortion is directed to occur if it is necessary to prevent physical or emotional harm to a pregnant person, even if there is not a physical health risk that is likely to cause substantial and irreversible physical impairment of a major bodily function." *Id.*

[10] In conjunction with their Complaint, Plaintiffs sought a preliminary injunction to prevent enforcement of the Abortion Law. The State objected, arguing that Hoosier Jews for Choice lacked standing to bring this action and that Plaintiffs' claims were unripe because none of them were pregnant or seeking an abortion. The State also argued that Plaintiffs were not entitled to a preliminary injunction because they were not likely to succeed on the merits of their RFRA claim.

[11] The trial court granted the preliminary injunction in a 42-page order containing thorough findings of facts and conclusions of law. *Id.* at 17. The trial court's key rulings were:

- Anonymous Plaintiffs have standing to seek a preliminary injunction.

- Hoosier Jews for Choice, which is asserting the rights of its members and not its own rights as an organization, has associational standing.

- The issues are ripe for adjudication because Plaintiffs are suffering injury and altering their sexual and/or reproductive behavior due to the restrictions in the Abortion Law.

- Plaintiffs are entitled to a preliminary injunction barring the State's enforcement of the Abortion Law against them until the court rules on the merits of their claims. In so ruling, the court found: (1) that Plaintiffs had shown that their remedies at law are inadequate, thus causing irreparable harm pending resolution until final judgment; (2) a reasonable likelihood of success at trial exists; (3) the threatened injury to Plaintiffs outweighs the potential harm to the State from a preliminary injunction; and (4) the public interest would be disserved if the preliminary injunction were not issued.

[12] The State appealed the entry of the preliminary injunction and, under Indiana Appellate Rule 56, petitioned to transfer the case from this Court to the Indiana Supreme Court. Plaintiffs objected to the State's petition, which our Supreme Court summarily denied by unanimous vote.

[13] While this appeal was pending, the trial court granted Plaintiffs' motion to certify the case as a class action. The court adopted Plaintiffs' proposed class definition, which provided:

> All persons in Indiana whose religious beliefs direct them to obtain abortions in situations prohibited by [the Abortion Law] who need, or will need, to obtain an abortion and who are not, or will not be, able to obtain an abortion because of the [Law].

Appellants' Class Action App. Vol. II, p. 58.

In response, the State moved for an interlocutory appeal under Indiana Appellate Rule 14(C), which applies to class action certifications. This Court accepted jurisdiction and consolidated the preliminary injunction and class action certification appeals.

While the present consolidated appeal was pending, our Supreme Court reversed a preliminary injunction issued in a Monroe County lawsuit filed by several Indiana abortion providers presenting a facial challenge to the Abortion Law. *Members of the Med. Licensing Bd. v. Planned Parenthood Nw., Haw., Alaska, Ind., Ky., Inc.*, 211 N.E.3d 957 (Ind. 2023). The abortion providers contended that a woman's right to "liberty" under Article 1, Section 1 of the Indiana Constitution encompasses a fundamental right to abortion and that the Abortion Law materially burdens a woman's exercise of this right.

Our Supreme Court rejected this facial challenge. It determined that "Article 1, Section 1 protects a woman's right to an abortion that is necessary to protect her life or to protect her from a serious health risk, but the General Assembly otherwise retains broad legislative discretion for determining whether and the extent to which to prohibit abortions." *Id.* at 962. The *Planned Parenthood* Court concluded that the plaintiffs failed to show a reasonable likelihood of success

that they could prove, in their facial challenge, that "there are no circumstances in which any part of [the Abortion Law] could ever be enforced consistent with Article 1, Section 1." *Id.* The Court thus vacated the preliminary injunction in that case. *Id.*

[17] The *Planned Parenthood* Court's ruling expressly left open the possibility of future constitutional attacks on the Abortion Law. *Id.* at 984-85. And although the Court defined a minimum right to abortion under Article 1, Section 1—that is, when the abortion is "necessary to protect [the pregnant woman's] life or to protect her from a serious health risk"—it did not expound on the potential breadth of that right. *Id.* at 976. Furthermore, *Planned Parenthood* neither involved nor addressed the Abortion Law in the context of a RFRA challenge.

## Discussion and Decision

[18] The State raises five primary issues, which we resolve as follows:

>    I.   The issues are justiciable. Hoosier Jews for Choice has associational standing to raise its members' RFRA challenges to the Abortion Law. Plaintiffs' claims are ripe, although the Plaintiffs are not now pregnant or seeking an abortion.
>
>    II.  The trial court properly certified the case as a class action.
>
>    III. A preliminary injunction was merited.
>
>    IV.  The scope of the injunction was overbroad so we remand to the trial court for adjustment.

# I. Justiciability of Plaintiffs' Claims

The State's standing and ripeness claims fall within the general doctrine of justiciability. *Garau Germano, P.C. v. Robertson*, 133 N.E.3d 161, 167 n.9 (Ind. Ct. App. 2019). "Justiciability . . . is '[t]he quality or state of being appropriate or suitable for adjudication by a court.'" *Berry v. Crawford*, 990 N.E.2d 410, 418 (Ind. 2013) (quoting *Black's Law Dictionary* 943 (9th ed. 2009)). "[J]usticiability is not a question of jurisdiction, but whether it is prudent for the Court to exercise its jurisdiction." *Citizens Action Coal. of Ind. v. Koch*, 51 N.E.3d 236, 241 (Ind. 2016).

## A. Standing of Hoosier Jews for Choice

We first turn to the State's claim that Hoosier Jews for Choice lacks standing. We review such issues de novo. *Ehrlich v. Moss Creek Solar, LLC*, 219 N.E.3d 760, 763 (Ind. Ct. App. 2022). "Standing is a key component in maintaining our state constitutional scheme of separation of powers." *Pence v. State*, 652 N.E.2d 486, 488 (Ind. 1995). The standing requirement imposes a limit on the court's jurisdiction by requiring that a litigant be "entitled to have a court decide the substantive issues of a dispute." *Solarize Ind., Inc. v. S. Ind. Gas & Elec. Co.*, 182 N.E.3d 212, 216 (Ind. 2022).

Although a party's standing may be conferred by statute or common law, plaintiffs must always meet the "irreducible minimum" standing requirements originating from the Indiana Constitution's separation of powers clause. *Id.*; *Lockerbie Glove Co. Town Home Owner's Ass'n v. Indpls. Hist. Pres. Comm'n*, 194

N.E.3d 1175, 1183 (Ind. Ct. App. 2022). These requirements mandate that a plaintiff "demonstrate a sufficient injury" that is "personal, direct, and one the plaintiff has suffered or is in imminent danger of suffering." *Holcomb v. Bray*, 187 N.E.3d 1268, 1286 (Ind. 2022). Thus, the invalidity of "a particular statute . . . is almost never a sufficient rationale for judicial intervention; the party challenging the law must show adequate injury or the immediate danger of sustaining some injury." *Pence*, 652 N.E.2d at 488. This determination is made "by looking at a lawsuit's allegations—not its outcome." *Holcomb*, 187 N.E.3d at 1286.

### i. Associational Standing Is Widely Recognized

[22] RFRA confers standing on an organization under certain circumstances. It provides that "[a] person whose exercise of religion has been substantially burdened, or is likely to be substantially burdened, by a [RFRA] violation" may assert a RFRA claim. Ind. Code § 34-13-9-9. A "person" in this context includes "[a]n organization," "a religious society," and "a group organized and operated primarily for religious purposes." Ind. Code § 34-13-9-7(2).

[23] Though Hoosier Jews for Choice is a "person" under RFRA, the organization does not allege any violation of its own RFRA rights. Without more, Hoosier Jews for Choice cannot meet the "irreducible minimum" standing requirements. *See Solarize,* 182 N.E.3d at 216. Hoosier Jews for Choice instead asserts a cognizable injury to its members in the form of RFRA violations. Hoosier Jews for Choice therefore claims associational standing, a concept

rarely applied in Indiana state courts but long ago accepted by federal courts and many state courts.

[24] Associational standing, a 20th century offshoot of third-party standing, "is largely a creature of federal law, and permits an association to sue on behalf of one or more of its members" under certain circumstances. *Bd. of Comm'rs of Union Cnty. v. McGuinness*, 80 N.E.3d 164, 169 (Ind. 2017). Sometimes described as "representational" or "organizational" standing, this concept was at the forefront of the U.S. Supreme Court's landmark decision last summer in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (ruling in favor of an organization with associational standing that race-based affirmative action programs in college admissions processes violated the Fourteenth Amendment to the United States Constitution).

[25] In recognizing the associational standing of the plaintiff, a non-profit organization alleging injury to its student members and not to itself, the Court relied on the test enunciated in *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977). Under the *Hunt* test, which is used extensively in the federal court system, an organization has standing to raise the claims of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.*

[26] A large number of state courts, like their federal brethren, have found value in the associational standing doctrine. As of 2008, nearly half had adopted associational standing.[4] These states typically have relied on the *Hunt* test or some modified version of it in determining whether plaintiffs qualified for associational standing. *See, e.g.*, *City of Pikeville v. Ky. Concealed Carry Coal., Inc.*, 671 S.W.3d 258, 264 (Ky. 2023) (requiring proof of only the first *Hunt* requirement for associational standing); *Ill. Road & Transp. Builders Assoc. v. Cnty. of Cook*, 204 N.E.3d 189, 195-97 (Ill. 2022) (applying unmodified *Hunt* test in determining associational standing).

[27] Indiana courts have been slower to embrace the associational standing doctrine. But two panels of this Court have recognized associational standing, and both applied the *Hunt* test. *See, e.g.*, *Bd. of Comm'rs in Cnty. of Allen v. Ne. Ind. Bldg. Trades Council*, 954 N.E.2d 937, 941 (Ind. Ct. App. 2011) ("We find associational standing to be the most helpful lens for analysis, and thus address whether the Appellees have associational standing to sue on behalf of their members"), *trans. denied*; *Save the Valley, Inc. v. Ind.-Ky. Elec. Co.*, 820 N.E.2d 677, 680-82 (Ind. Ct. App. 2005) (concluding that plaintiff organizations had associational standing after noting two dozen states that have accepted the doctrine of associational standing).

---

[4] *See, e.g.*, *Interactive Gaming Council v. Brown*, 425 S.W.3d 107, 114 (Ky. Ct. App. 2014) (stating "most of our sister states have adopted associational standing"); *Int'l Union of Operating Eng'rs, Local 148 v. Ill. Dep't. of Emp. Sec.*, 828 N.E.2d 1104, 1112 (Ill. 2005) (identifying 24 states that have adopted associational standing with some version of the *Hunt* test).

Our Supreme Court has neither explicitly recognized nor denounced associational standing. *Cf. Bd. of Comm'rs of Union Cnty*, 80 N.E.3d at 170 (assuming, without deciding, that associational standing was available).[5] We therefore follow the lead of the two panels of this Court, many other state courts, and the federal courts and recognize the doctrine of associational standing. We also find that the *Hunt* test, relied upon by these courts in pure or altered form, is the proper test for determining whether associational standing exists.

## ii. Associational Standing Is Beneficial to the Pursuit of Justice

Assuming the requirements of the *Hunt* test are met, recognizing associational standing has broad benefits. *See Lockerbie Glove Co. Town Home Owner's Ass'n,* 194 N.E.3d at 1183; *Save the Valley*, 820 N.E.2d at 680-81. "[A]llowing an association to represent its members' interests promotes judicial economy and efficiency." *Save the Valley*, 820 N.E.2d at 680. Clothed in associational standing, "a single plaintiff, in a single lawsuit, [may] adequately represent the interests of many members, avoiding repetitive and costly independent actions." *Id.* The association's members who have individual standing, in turn, may "pool their financial resources and legal expertise to help ensure complete and vigorous litigation of the issues." *Id.* at 680-81. A third recognized benefit is

---

[5] In its recent decision in *Planned Parenthood*, 211 N.E.3d at 966, our Supreme Court stated that third parties must "have their own direct injury" to have standing in cases in which they raise the claims of others. But *Planned Parenthood* did not involve associational standing, so we therefore do not read it as rejecting the doctrine.

that "associations are generally less susceptible than individuals to retaliations by officials responsible for executing the challenged policies." *Id.* at 681.

[30] The value of associational standing is evident in the RFRA context. Plaintiffs who believe their RFRA rights have been violated may be unable to pursue litigation due to the cost. They also may be unwilling to step forward individually and share intimate details of their religious beliefs or private conduct in the way that a RFRA challenge to statutory limitations may require.

### iii. Trial Court Correctly Determined that Hoosier Jews for Choice Has Associational Standing

[31] We reject the State's claim that Hoosier Jews for Choice does not meet the requirements for associational standing. The first two *Hunt* requirements are easily met here. And though the third requirement is more difficult to assess, we ultimately find that Hoosier Jews for Choice has met it.

### a. First Two *Hunt* Requirements Met

[32] No disagreement exists as to the first *Hunt* requirement: that the organization's members would otherwise have standing to sue in their own right. The State attacks only the standing of Hoosier Jews for Choice, not of its membership. As the parties do not dispute that individual members of Hoosier Jews for Choice have standing to sue in their own right, we find the first *Hunt* requirement is met.

[33] The record is equally clear as to the second *Hunt* requirement: that the interests the organization seeks to protect are germane to its purpose. Hoosier Jews for

Choice's stated purpose is "to take action within the Jewish community and beyond to advance reproductive justice, support abortion access, and promote bodily autonomy for all people across the state of Indiana." Appellants' Prelim. Inj. App. Vol. II, p. 149. In this litigation, Hoosier Jews for Choice is asserting its members' rights under RFRA by seeking to halt the Abortion Law's restrictions on reproductive choices that conflict with its members' exercise of their sincerely held religious beliefs. This conduct falls within the organization's stated goals.

## b. Third *Hunt* Requirement Met

[34] *Hunt's* third requirement—that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit—is a closer question. In asserting its members' RFRA claims, Hoosier Jews for Choice alleges that its members' sincerely held religious beliefs dictate that reproductive health care decisions be left to the individual members. Hoosier Jews for Choice claims each member must decide whether prioritizing her physical, mental, or emotional health over that of the potential life—as directed by the member's religious beliefs—requires the termination of a pregnancy.

[35] The parties debate whether the personal nature of this claim requires the individual members' participation in this lawsuit. In arguing that the individual members must participate, the State relies heavily on *Harris v. McRae*, 448 U.S. 297 (1980).

[36] In *Harris*, a church organization, relying on the First Amendment's religion clauses, joined other plaintiffs in seeking to enjoin enforcement of legislation known as the Hyde Amendment. *Id.* at 302-06. The Amendment limited funding for abortions under the Medicaid program. *Id.* at 302. The organization's membership purported to include "pregnant, Medicaid eligible women who, as a matter of religious practice and in accordance with their conscientious beliefs, would choose but are precluded or discouraged from obtaining abortions reimbursed by Medicaid because of the Hyde Amendment." *Id.* at 321.

[37] The *Harris* Court ruled that the organization lacked associational standing under the *Hunt* test because the organization's claim required the participation of its individual members. *Id.* The Court reasoned:

> [The organization] concedes that "the permissibility, advisability and/or necessity of abortion according to circumstance is a matter about which there is diversity of view within . . . our membership, and is a determination which must be ultimately and absolutely entrusted to the conscience of the individual before God." It is thus clear that the participation of individual members of the [organization] is essential to a proper understanding and resolution of their free exercise claims.

*Id.*

[38] The State contends that a similar diversity of views exists among the members of Hoosier Jews for Choice. But the State's argument largely depends on an exaggeration of the deposition testimony of a founding member of the

organization. The State contends, for instance, that the founding member "conceded" that Hoosier Jews for Choice would accept members who "disagree" about when abortions should be permitted. However, the founding member's testimony was far more conjectural.

[39] He testified that prospective members must sign a document similar to a statement of belief attesting to their agreement with certain Jewish tenets. Appellants' Prelim. Inj. App. Vol. V, p. 35. He described these Jewish tenets as including beliefs that: 1) no separate life exists during pregnancy; 2) no being with rights independent of the pregnant woman exists during pregnancy; and 3) an abortion is "directed to occur if it is necessary to prevent physical or emotional harm to a pregnant person." *Id.* at 32-36. When asked whether membership restrictions would attach to a person who believes women should have the choice of abortion but does not follow these Jewish tenets, the founding member testified that he "believe[d] so" and that he "definitely [would] want to hear them out" so he could be "more informed and understand them." *Id.* at 35-36. But he conditioned those statements, noting that "I'm not the end-all-be-all of Hoosier Jews for Choice" because "[i]t's a group organization." *Id.* at 36.

[40] The State also suggests the founding member "conceded" that any decision about the necessity of an abortion is for the pregnant person to make individually. In fact, the founding member's testimony was far less conclusive.

The founding member testified that the pregnant woman would be violating Jewish law and tradition if she did not have an abortion when Jewish law and tradition directed it. *Id.* at 61. The decision whether to follow the tenets of Jewish faith or violate Jewish law is an individual decision, as is the determination of whether the pregnancy would harm the pregnant person's physical or emotional well-being, according to the founding member's testimony. *Id.* at 33, 61.

Contrary to the State's claim, no part of the founding member's testimony establishes that Hoosier Jews for Choice's members have disparate religious beliefs as to abortion. His testimony revealed no members of Hoosier Jews for Choice who do not subscribe to the Jewish tenets that he discussed. His testimony, in fact, corroborates the allegations in Plaintiffs' Complaint that Hoosier Jews for Choice "is made up of persons who believe that under Jewish law and religious doctrine, life does not begin at conception, and that a fetus is considered a physical part of the woman's body, not having a life of its own or independent right." Appellants' Prelim. Inj. App. Vol. II, p. 36. His testimony also is consistent with Plaintiffs' allegations that Hoosier Jews for Choice and its members "believe that under Jewish law an abortion is directed to occur if it is necessary to prevent physical or emotional harm to a pregnant person, even if there is not a physical health risk that is likely to cause substantial and irreversible physical impairment of a major bodily function." *Id.*

This basic commonality of views among Hoosier Jews for Choice's membership was missing in *Harris*. Unlike Hoosier Jews for Choice, the

plaintiff organization in *Harris* conceded a "diversity of view" within its membership as to "the permissibility, advisability and/or necessity of abortion according to circumstance." *Harris*, 448 U.S. at 321. Noting that a free exercise case requires a plaintiff "to show the coercive effect of the [challenged] enactment as it operates against him in the practice of his religion," the *Harris* court determined, based on the organization's concession, that "the participation of individual members of the [plaintiff organization] is essential to a proper understanding and resolution of their free exercise claims." *Id.*

[44] Unlike Hoosier Jews for Choice, the plaintiff organization in *Harris* did not allege its members were "directed" by their religion to obtain an abortion under specific circumstances in which the challenged law would restrict abortion access. Whereas the members in *Harris* did not agree as to "the permissibility, advisability and/or necessity of abortion," Hoosier Jews for Choice has alleged its members "believe that under Jewish law an abortion is directed to occur if it is necessary to prevent physical or emotional harm to a pregnant person." *Id.*; Appellants' Prelim. Inj. App. Vol. II, p. 36. As the Abortion Law restricts abortions necessary to prevent physical or emotional harm to a pregnant person, an understanding of the coercive effect of the Abortion Law as it operates against the individual members of Hoosier Jews for Choice in their exercise of religion is not dependent on their individual participation in this lawsuit.

[45] Our ruling is consistent with federal decisions finding that even some disparity of views or interests among the organization's members does not render

associational standing unavailable. *See, e.g.*, *Catholic Benefits Ass'n LCA v. Sebellius*, 24 F.Supp.3d 1094, 1100-02 (W.D. Okla. 2014) (rejecting the notion that "*Harris* dictates that all RFRA claims require individual participation" and finding organization representing employers had associational standing based on its members' shared submission to "Catholic conviction that contraceptives violate their conscience," despite other disparities); *Nat'l Mar. Union of Am., AFL-CIO v. Commander, Mil. Sealift Command*, 824 F.2d 1228, 1234 (D.C. Cir. 1987) (ruling that "the mere fact of conflicting interests among members of an association does not of itself defeat the association's standing").

[46]  Moreover, *Hunt*'s third requirement is based on prudential rather than constitutional constraints. *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 556-57 (1996).[6] Rules of prudential standing—considered more flexible than their constitutional counterparts—are "best seen as focusing on . . . matters of administrative convenience and efficiency." *Id.*; *United States v. Windsor*, 570 U.S. 744, 757 (2013). In this regard, *Hunt*'s third requirement has three central purposes: (1) to "promote adversarial intensity"; (2) to "guard against the hazard of litigating a case to the damages stage only to find the plaintiff lacking detailed records or the evidence necessary to show the harm with sufficient specificity"; and (3) to hedge against any risk that the

---

[6] *Hunt*'s first two requirements are spawned by the federal constitution's "case or controversy" requirement applicable to federal courts whereas the third *Hunt* requirement, as a "prudential" rule of standing, essentially is self-imposed judicial restraint. *Brown Grp.*, 517 U.S. at 555-57; *see also Schulz v. State*, 731 N.E.2d 1041, 1044 (Ind. Ct. App. 2000) (adopting certain federal prudential standing limitations as "equally applicable to questions of standing under the Indiana [C]onstitution").

damages recovered by the association will fail to find their way into the pockets of the members on whose behalf injury is claimed. *Brown Grp.*, 517 U.S. at 556-57. These purposes already are served in this case.

[47] For instance, adversarial intensity exists in this case even without the participation of Hoosier Jews for Choice's members. The record on appeal, the quality of the parties' lengthy written submissions and their oral presentations, and the number of amici curiae vividly illustrate this point. Moreover, Hoosier Jews for Choice already has provided substantial evidence from non-member sources like Jewish scholars and rabbis showing that its members' religious beliefs conflict with the Abortion Law.

[48] Finally, the relief sought in this case is injunctive relief, not damages. Where only injunctive relief is sought, associational standing is more easily established, partly because the relief is uniform. *Id.* at 546 (noting that damages claims necessarily involve individualized proof and therefore the individual participation of association members).

[49] For all these reasons, we conclude that Hoosier Jews for Choice has met *Hunt*'s third requirement and has associational standing.[7]

---

[7] We note that an Idaho state court and an Indiana federal district court have rejected an organization's claim of associational standing in a RFRA challenge to post-*Dobbs* statutory restrictions on abortions. *See Satanic Temple v. Labrador*, 2024 WL 357045 (D. Idaho Jan. 31, 2024) (finding that plaintiff organization lacked associational standing because it failed to specify the identity of any of its members who had been or would be injured by the abortion law); *Satanic Temple, Inc. v. Rokita*, 2023 WL 7016211 (S.D. Ind. Oct. 25, 2023) (rejecting associational standing when organization failed to identify any of its members and relied only on

## B. Ripeness

We next consider the State's claim that the Plaintiffs' claims are not ripe. The ripeness doctrine is linked to the principles underlying standing. *Horner v. Curry*, 125 N.E.3d 584, 589 (Ind. 2019) (describing ripeness as a "corollary doctrine[]" to standing).

Whereas standing first asks "whether a litigant is entitled to have a court decide" its substantive claims, "ripeness asks whether the claim is sufficiently developed to merit judicial review." *Holcomb*, 187 N.E.3d at 1285. In other words, ripeness "involves the timing of judicial review and the principle that judicial 'machinery should be conserved for problems that are real and present or imminent, not squandered on problems that are abstract or hypothetical or remote.'" *Ind. Fam. Inst., Inc. v. City of Carmel*, 155 N.E.3d 1209, 1218 (Ind. Ct. App. 2020) (quoting *In re Paternity of M.G.S.*, 756 N.E.2d 990, 1004 (Ind. Ct. App. 2001)).

For a claim to be ripe, "there must exist not merely a theoretical question or controversy but a real or actual controversy, or at least the ripening seeds of such a controversy." *Holcomb*, 187 N.E.3d at 1287 (quoting *Zoercher v. Agler*, 202 Ind. 214, 172 N.E. 186, 189 (1930)). Put simply, "the issues in a case must be

---

statistical probabilities). These decisions do not support a different result here. The State does not claim that Hoosier Jews for Choice has not identified its membership or those who allegedly have suffered or will suffer harm from the Abortion Law. In fact, the State deposed members of Hoosier Jews for Choice and referred to them by name during the depositions.

based on actual facts rather than abstract possibilities." *Id.* A claim that "rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all'" is not ripe for adjudication and therefore not subject to appellate review. *Texas v. United States*, 523 U.S. 296, 300 (1988) (quoting *Thomas v. Union Carbide Agric. Prods., Co.*, 473 U.S. 568, 580-81 (1985)); *see also Garau Germano*, 133 N.E.3d at 168.

[53] The essence of Plaintiffs' claim is that the Abortion Law "severely burdens [their] sincere religious beliefs" under RFRA by banning abortions under circumstances when their "sincere religious beliefs . . . direct them to obtain an abortion." Appellants' Prelim. Inj. App. Vol. II, p. 61. We agree with the trial court that this claim is ripe.

### i. Standard of Review

[54] Indiana courts have taken divergent approaches when analyzing ripeness. Some panels of this Court have borrowed the federal courts' two-part test for ripeness. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (considering during the ripeness determination the fitness of the issues for judicial decision and the hardship to the parties caused by withholding court consideration); *see also Garau Germano*, 133 N.E.3d at 168 (citing the test for ripeness used in *Pac. Gas & Elec. Co.*); *Brogan v. State*, 925 N.E.2d 1285, 1289 (Ind. Ct. App. 2010) (same).

[55] Other Indiana appellate cases have relied simply on our Supreme Court's language, found in *Holcomb* and other decisions, focusing on the requirements

of "a real or actual controversy, or at least the ripening seeds of such a controversy," that is "based on actual facts and not abstract possibilities." *Holcomb*, 187 N.E.3d at 1287 (citing *Zoercher*, 172 N.E. at 189).

[56] Our Supreme Court has never cited the federal test for ripeness except in a case considering whether federal law preempted state law. *See Hardy v. Hardy*, 963 N.E.2d 470, 474 n.3 (Ind. 2012) (approving Court of Appeals' analysis of ripeness that incorporated federal ripeness test, although ripeness issue was raised on transfer). Accordingly, in addressing the State's argument that the Plaintiffs' RFRA claims are unripe, we follow the lead of *Holcomb* and determine whether the Plaintiffs' RFRA claims reveal "a real or actual controversy, or the ripening seeds of a real controversy," based on actual facts, not abstract possibilities. *Holcomb*, 187 N.E.3d at 1287 (quoting *Zoercher*, 172 N.E. at 189).

## ii. Plaintiffs' Claims Are Ripe

[57] The State asserts that the Plaintiffs' RFRA claims are too undeveloped to determine whether the Abortion Law substantially burdens their sincere religious exercise or whether any such burden furthers the State's compelling interest.[8] The State focuses on two specific characteristics of the Anonymous

---

[8] The State also argues that the trial court erroneously found Plaintiffs' claim was ripe because they "are doing as did the Governor in *Holcomb v. Bray* and [are] merely challenging the validity of a statute." Appellants' Prelim. Inj. App. Vol. II, p. 40 (citing 187 N.E.3d 1268, 1275 (Ind. 2022)). This comparison is erroneous. *Holcomb* centered on the Governor's argument that the challenged statute was unconstitutional on its face—a claim that does not require consideration of the facts. *Holcomb*, 187 N.E.3d at 1287 n.9. Plaintiffs

Plaintiffs: 1) their sincere religious beliefs ultimately leave to them as individuals the final decision on whether an abortion is mandated by those beliefs; and 2) they are not now pregnant.

[58] The State notes that after a plaintiff establishes a RFRA violation, RFRA requires that the State prove a compelling government interest that is satisfied through application of the challenged law to the particular claimant whose sincere exercise of religion is being substantially burdened. *See*, *e.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006). The State claims this is a claimant-by-claimant, fact-sensitive inquiry that is impossible to conduct before Plaintiffs are pregnant. The State therefore insists pregnancy is an essential condition to Plaintiffs' relief. [9]

[59] The State further contends that the lack of any pregnant Plaintiffs renders this case merely an abstract dispute because Plaintiffs have not yet been burdened by the Abortion Law. According to the State, whether any Plaintiff will even become pregnant—and whether those who do would be directed by their religious beliefs to terminate the pregnancy under circumstances prohibited by

---

here are not challenging the constitutionality of the Abortion Law. Instead, they are challenging the Abortion Law as applied to them, contending this application violates their rights under RFRA. Although the facial challenge in *Holcomb* lacked the fact sensitivity of this appeal, *Holcomb*'s general statements about ripeness remain equally applicable here.

[9] In response, Plaintiffs claim the State's argument is tantamount to a rule that only pregnant persons may challenge an abortion ban. And thus, due to the temporary nature of pregnancy, such a law will be impossible to challenge. This claim confuses ripeness and mootness. *See Garau Germano,* 133 N.E.3d at 167 (noting that the justiciability doctrine has four major categories: standing (who may sue), ripeness (when is the suit appropriate), mootness (whether the suit involves an active dispute), and political question (whether the dispute should be left to the political branches)).

the Abortion Law—is inherently speculative and based on "abstract possibilities.'" Appellants' Prelim. Inj. Br., p. 34.

[60] We agree that pregnancy, by its very nature, defies simple prediction. Some women become pregnant despite their use of contraceptives. Other women fail to become pregnant even when actively seeking that result. But Plaintiffs have alleged and presented evidence to support a substantial burdening of the exercise of their sincere religious beliefs in the form of altered sexual and reproductive patterns.

[61] Due to their inability to obtain an abortion as their religious beliefs dictate, Anonymous Plaintiffs 1, 4, and 5 have alleged they are not attempting to become pregnant when they otherwise would. Anonymous Plaintiffs 1 and 2 report that they have severely decreased their sexual intimacy with their husbands due to concerns about becoming pregnant while the Abortion Law's restrictions are in effect. Some members of Hoosier Jews for Choice also have altered their sexual and reproductive practices in response to the Abortion Law. We agree with Plaintiffs and the trial court that these changes show a substantial burdening of the religious exercise of Plaintiffs and that these allegations of existing harm from the Abortion Law render Plaintiffs' lack of pregnancy irrelevant to ripeness.

Although no Indiana appellate court has addressed the ripeness of a RFRA claim,[10] ripeness decisions in non-RFRA contexts have informed our analysis and support our finding. Indiana appellate courts repeatedly have found claims ripe in the face of arguments, like the State's here, that the plaintiffs had yet to suffer actual injury.

Most recently, in *Morales v. Rust*, 228 N.E.3d 1025, 1034 (Ind. 2024), our Supreme Court ruled that a candidate who preemptively sued to prevent his removal from the ballot alleged a ripe claim. Noting that "[a]ny lingering doubts about . . . ripeness have been quelled because [the candidate] alleges [the challenged election law] infringes on his constitutional rights," the Court ultimately determined that the candidate's claim was ripe because he was "in imminent danger of suffering" a real—not a theoretical—injury to his rights." *Id.*

*Morales* is consistent with other Indiana appellate decisions that have found a claimant's action ripe without proof of an existing injury. For instance, in *Nichols v. State*, 947 N.E.2d 1011, 1016 n.4 (Ind. Ct. App. 2011), the Court found a probationer's claim that his mandatory sex offender registration should be for 10 years, rather than for life, was ripe. This was so despite the

---

[10] Only one Indiana appellate court has been faced with an argument that a RFRA claim is unripe. *Ind. Fam. Inst. Inc. v. City of Carmel*, 155 N.E.3d 1209 (Ind. Ct. App. 2020). But the *Family Institute* panel ultimately decided the plaintiffs lacked standing to raise their RFRA claims and did not reach the ripeness issue. *Id.* at 1218-21.

defendant's lack of actual injury until the 10-year period expired without his removal from the list. *Id.*

[65] Similarly, in *In re Peeples*, 37 N.E.3d 502, 512 (Ind. Ct. App. 2015), the Court found a trustee's challenge to the trial court's imposition of expense and hiring limitations to be ripe, despite the lack of evidence that the trustee would ever have needs beyond those restrictions. The Court ruled:

> [The appellant's] decision-making as trustee will be affected by the limit, even if it does not go to the trial court seeking more money. Also, as things stand, before considering engaging the services of a third party, [the appellant] must weigh whether it is worth the additional trouble and expense of petitioning the trial court for permission to do so. We consider these restrictions to be more than abstract possibilities when viewed from [the appellant's] perspective.

*Id.* at 512.

[66] Finally, in *Ind. Educ. Emp. Relations Bd. v. Benton Cmty. Sch. Corp.*, 266 Ind. 491, 496, 365 N.E.2d 752, 754-55 (1977), the Court rejected a ripeness challenge to a declaratory action challenging the constitutionality of a statute requiring a hearing to determine organized labor representation from which the school corporation would have no right to judicial review. In an opinion that intertwined standing and ripeness analyses, the Court, finding the lawsuit was not premature, reasoned:

> We know of no principle requiring a party who deems himself assaulted by a statute, believed to be unconstitutional, to defer such challenge until he has been battered and to decry the

> validity of his adversary's constitutional authority only with his dying breath.

*Benton Comty. Sch. Corp.*, 266 Ind. at 499, 365 N.E.2d at 755.

Thus, the courts in *Morales*, *Nichols* and *Peeples* found ripeness despite the lack of existing injury to the litigant. *Peeples* also involved uncertainty as to whether the challenged action would ever cause the ultimate harm alleged. The anticipated harm in *Benton* was more definite but, as in *Morales*, *Nichols* and *Peeples*, had not yet occurred. All four courts found either immediate or imminent injury caused by the challenged action rendered the claims ripe.

Plaintiffs here have made a greater showing of harm than the litigants whose claims were found ripe in *Morales*, *Nichols*, *Peeples*, and *Benton*. Through evidence of their sexual and reproductive changes compelled by the Abortion Law, they have established an "actual controversy" that is ripe. *See Holcomb*, 187 N.E.3d at 1287. As the trial court found, "The undisputed evidence shows why the Plaintiffs have taken these [restricted intimacy or restricted family growth] measures because their only alternative is the unacceptable risk of needing a termination of a pregnancy that would be required by their religious beliefs but prohibited by [the Abortion Law]." Appellants' Prelim. Inj. App. Vol. II, p. 41.

But even if Plaintiffs did not establish existing harm from the Abortion Law that constitutes an "actual controversy," their RFRA claims are ripe because they have established "the ripening seeds of such a controversy." *See Holcomb*,

187 N.E.3d at 1287. Indiana RFRA specifies that "[a] person whose exercise or religion has been substantially burdened, *or is likely to be substantially burdened*, by a violation of this chapter *may assert the violation or impending violation* as a claim . . . ." Ind. Code § 34-13-9-9 (emphasis added). In light of this statutory language and our Supreme Court's ripeness holding in *Morales*, *supra*, which found a claim ripe based on imminent future injury, a litigant who establishes an impending RFRA violation logically would have a ripe claim.

[70] In addition to alleging an existing RFRA violation relating to changes to their sexual and reproductive activity compelled by the Abortion Law, Plaintiffs also have alleged an impending RFRA violation. They assert that if they were to become pregnant, they would be substantially burdened by the Abortion Law by being unable to obtain an abortion that their religious beliefs direct. They are sexually active women capable of bearing children so the prospect of pregnancy without the availability of a religiously directed abortion is evident. Given these assertions of an impending violation, the lack of pregnancy alone does not render Plaintiffs' claims unripe, just as in *Morales*, *supra*, the candidate's lack of removal from the ballot did not render his claim unripe while an imminent constitutional violation loomed. Instead, Plaintiffs' non-pregnant status, standing alone, would translate into an unripe claim under Indiana Code § 34-13-9-9 only if Plaintiffs' exercise of religion "has not been substantially burdened" or is not "likely to be substantially burdened," by the Abortion Law. *Id.*

Through their allegations that the Abortion Law bars them from obtaining abortions that their religious beliefs direct, Plaintiffs have shown that their religious exercise is likely to be substantially burdened by the Abortion Law. *See, e.g.*, *Doster v. Kendall*, 54 F.4th 398, 416-17 (6th Cir. 2022) (finding service members' federal RFRA claims were ripe because they had established an imminent injury from the challenged vaccine mandate, although they had not taken the required vaccine and the military had not yet enforced the mandate), *cert. granted*, *judgment vacated on other grounds*, 144 S. Ct. 481 (2023); *Chelsey Nelson Photography, LLC v. Louisville/Jefferson Cnty. Metro Gov't*, 624 F.Supp.3d 761, 781-82 (W.D. Ky. 2022) (ruling that wedding photographer's pre-enforcement challenge under RFRA to an ordinance guaranteeing access to goods and services regardless of sexual orientation was ripe).

We conclude that Plaintiffs' claims are ripe because they present at least the "ripening seeds of a . . . controversy," if not an already existing "real or actual controversy," that is based on facts, not "abstract possibilities." *See Holcomb*, 187 N.E.3d at 1287; *Planned Parenthood Ctr. of Tucson, Inc. v. Marks*, 17 Ariz. App. 308, 312-13, 497 P.2d 534, 539 (1972) (finding in this pre-*Roe v. Wade* decision that a challenge to the constitutionality of statutes criminalizing abortion was justiciable, despite the lack of a pregnant petitioner, and rejecting the argument that the plaintiffs would have to wait to be prosecuted under the statute before the issues would be ripe).

## II. Class Action Certification

[73] The State next contends the trial court abused its discretion in certifying this case as a class action. We review a trial court's class action certification ruling for an abuse of discretion. *LHO Indpls. One Lessee, LLC v. Bowman,* 40 N.E.3d 1264, 1269 (Ind. Ct. App. 2015).

[74] Class action certification does not involve consideration of the merits of the claims. *Id.* at 1268. Instead, the trial court assumes the merits of an action and determines whether the named plaintiff has satisfied the requirements for class action certification under Indiana Trial Rule 23. *Id.* A party requesting class action certification carries the burden of proving that the proposed class meets all the requirements of Trial Rule 23(A) and at least one of the requirements of Trial Rule 23(B). *Id.* at 1269.

[75] Trial Rule 23(A) provides that a plaintiff may sue as a representative on behalf of a class if these four requirements are met:

1. The class is so numerous that joinder of all members is impracticable ("numerosity").

2. There are questions of law or fact common to the class ("commonality").

3. The claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality").

4. The representative parties will fairly and adequately protect the interests of the class ("adequacy").

As for Trial Rule 23(B), the trial court found that Plaintiffs met subsection 2, which requires that:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Ind. Trial Rule 23(B)(2).

Along with the express requirements of Trial Rule 23, Indiana courts have imposed an implicit "definiteness" requirement for class action certification. *LHO*, 40 N.E.3d at 1269. "A properly defined class is necessary at the onset because a judgment in a class action has a *res judicata* effect on absent class members." *Id.*

The State contends that Plaintiffs failed to prove all the class action certification requirements. We reject the State's claim and find no abuse of discretion in the trial court's class action certification.

## A. The Class is Sufficiently Definite

The trial court approved the following class definition:

> All persons in Indiana whose religious beliefs direct them to obtain abortions in situations prohibited by [the Abortion Law] who need, or will need, to obtain an abortion and who are not, or will not be, able to obtain an abortion because of the [Law].

Appellants' Class Action App. Vol. II, p. 58. The State argues that the proposed class is not definite because it is based on religious beliefs, motivations, and needs that are inherently subjective and externally unobservable.

[80] "The class definition must be specific enough for the court to determine whether or not an individual is a class member." *Wal-Mart Stores, Inc. v. Bailey*, 808 N.E.2d 1198, 1201 (Ind. Ct. App. 2004). "If the definition includes persons without interests or standing in the lawsuit, it is not adequate." *Indep. Hill Conservancy Dist. v. Sterley*, 666 N.E.2d 978, 981-82 (Ind. Ct. App. 1996).

[81] The State focuses on Plaintiffs' assertions that their religious beliefs leave to the individual Plaintiff the ultimate decision on when those beliefs mandate an abortion. The State claims this subjective determination renders the class indefinite because class certification cannot depend on a state of mind. But the State's argument is too broad because the core belief of the members remains uniform.

[82] Plaintiffs share the view that their sincere religious beliefs require abortions that are prohibited by the Abortion Law. Although their religious beliefs may differ as to when abortions are mandated, varying religious beliefs among the class have not barred certification in numerous federal RFRA cases. *See, e.g.*, *Doster*, 54 F.4th at 441 (affirming class certification in RFRA litigation brought by Air Force servicemembers of various faiths challenging COVID-19 vaccine mandate); *DeOtte v. Azar*, 332 F.R.D. 188, 197 (N.D. Tex. 2019) (acknowledging that "a person's religious beliefs are deeply personal and

subjective" but that "the contours of those beliefs are purely objective" and therefore certifying a class in RFRA litigation challenging the Patient Protection and Affordable Care Act's mandatory contraceptive coverage). The State has not established that the trial court abused its discretion in defining the class.[11]

[83] We also reject the State's claim that a "fail-safe class" was created here. A "fail-safe class" is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). "Such a class definition is improper because a class member either wins, or by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Id.* But because the trial court's class definition does not incorporate all the requirements that a class member must have to succeed under RFRA, it is not a "fail-safe class." *See, e.g.*, Ind. Code §§ 34-13-9-9 (requiring that Plaintiffs be "substantially

---

[11] In arguing that the class definition is not definite, the State relies primarily on two federal district court rulings denying class action certification in cases involving religious claims. The first is *Lindh v. Dir. Fed. Bureau of Prisons*, No. 2:14-cv-151, 2015 WL 179793 (S.D. Jan. 14, 2015), in which a prisoner challenged clothing rules that prevented him from wearing his pants above his ankles as allegedly prescribed by his faith. The United States District Court for the Southern District of Indiana found indefinite the following proposed class: "all male Muslim prisoners confined within the Bureau of Prisons." *Id.* at *1-3. The second case relied upon by the State is *West v. Carr*, 337 F.R.D. 181 (W.D. Wis. 2020), in which the United States District Court for the Western District of Wisconsin found indefinite a class defined as: prisoners "who have experienced or are likely to experience a cancellation of [an Umbrella Religious Group] congregate religious service or study group, where such service or study group is a religious exercise." *Id.* at 186.

But the denial of class action certification in *Lindh* was based on undisputed evidence that not all Muslims believed that their faith required males to wear their pants above the ankle. *Lindh*, 2015 WL 179793, at *7. And *West* involved no common religious beliefs. 337 F.R.D. at 190-91. *Lindh* and *West* therefore are distinguishable from this case, in which the class definition is specifically linked to the class members' religious beliefs that direct them to obtain abortions in situations prohibited by the Abortion Law.

burdened" by the challenged law).[12] The trial court did not abuse its discretion in finding the definiteness requirement satisfied.

## B. The Class Satisfies Trial Rule 23(A) Requirements

[84] The State also claims the trial court abused its discretion in certifying the litigation as a class action because the Plaintiffs did not meet any of the Trial Rule 23(A) requirements. We find no such deficiency.

## i. The Class Satisfies the Commonality Requirement

[85] The commonality requirement in Trial Rule 23(A)(2) focuses on the characteristics of the class. *LHO*, 40 N.E.3d at 1271. Commonality is satisfied if the claims of the individual plaintiffs stem from a common nucleus of operative fact—that is, a "common course of conduct." *Id.* (quoting *Connerwood Healthcare, Inc. v. Estate of Herron*, 683 N.E.2d 1322, 1327 (Ind. Ct. App. 1997)).

[86] Arguing that the commonality requirement mandates that each member of the proposed class suffers the same harm, the State contends the class members do not meet that requirement. But a panel of this Court rejected this very argument in *LHO*, a tainted food case in which some class members suffered symptoms of food poisoning and others just tested positive for salmonella without experiencing symptoms. The *LHO* Court ruled that "[t]he fact that members

---

[12] The State suggests various ways in which the class definition could be improved that do not rise to an abuse of discretion. If the class definition proves inadequate during the litigation, the trial court has discretion to adjust it before a final decision on the requested permanent injunction. *See* T.R. 23(C)(1) (specifying that class certification orders are "conditional, and may be altered or amended before the decision on the merits").

have a different degree of symptoms or damages does not negate the commonality component." *Id.* at 1272. Observing that "individual questions do not prevent a class action on common questions," the court concluded the plaintiffs had established "a common course of conduct" because the contaminated meals were served during a luncheon and evening event on the same date at the same hotel. *Id.*

[87] Here, Plaintiffs' shared claims—that their religious beliefs direct them to obtain abortions that the Abortion Law prohibits—are sufficient to establish a common course of conduct. At issue are the same laws (RFRA and the Abortion Law) and the same general injury (the unavailability of abortions that Plaintiffs' religious beliefs direct). *See DeOtte*, 332 F.R.D. at 197-99 (finding the commonality requirement met in a federal RFRA case in which plaintiff employers had differing religious beliefs but all challenged the Affordable Care Act's contraceptive coverage mandate and alleged the same broad injury—being forced to purchase insurance coverage for their employees that violated the employers' religious beliefs).

[88] Finding commonality here seems entirely consistent with other class action certifications in RFRA challenges to military COVID-19 inoculation mandates. *See, e.g.*, *Doster*, 54 F.4th at 419 (approving class certification, despite varying religious beliefs among the plaintiffs); *U.S. Navy SEALs 1-26 v. Austin*, 594 F.Supp.3d 767, 779 (N.D. Tex. 2022) (finding that proposed class met the commonality requirement because all of its members suffered the same core

injury—RFRA and First Amendment violations—although their damages might be diverse due to varying religious beliefs).

[89] In any case, the State's focus on varying harms allegedly suffered by Plaintiffs appears to be an improper invitation to consider the merits of Plaintiffs' claims. *See LHO*, 40 N.E.3d at 1268 (stating that a court "may not conduct a preliminary inquiry into the merits of the suit" when determining whether to certify a case as a class action); *Bolka*, 693 N.E.2d 613, 617 (Ind. Ct. App. 1998) (stating individual questions relating to potential defenses are irrelevant to class certification and therefore do not impact whether a common course of conduct exists).

[90] For similar reasons, we reject the State's parallel claim that a single remedy cannot cure the harm of each class member.[13] The trial court did not err in finding the commonality requirement met.

---

[13] The State misstates the trial court's class action certification order when it suggests the court "express[ly] concede[d] that a single injunction cannot provide a remedy benefiting the entire class." Appellants' Class Cert. Br., p. 44. The court ruled:

> To the extent that any future injunctive relief would need to be more narrowly fashioned to satisfy T.R. 65(D) and ensure that the remedy is only applicable to the claims as demanded by the putative class members, the Court has the capability to fashion such a remedy as needed. The contours of such a remedy do not need to be addressed at the class certification stage and may be addressed following further litigation on the merits of this case.

Appellants' Class Cert. App. Vol. II, p. 37. Thus, the trial court viewed a single injunction as capable of addressing all class members' claims, although the court recognized the injunction might need to be narrowly tailored to comply with Trial Rule 65(D).

## ii. The Class Satisfies the Adequacy of Representation and Typicality Requirements

The adequacy requirement in Trial Rule 23(A)(4) has three components: "(1) the chosen class representative cannot have antagonistic or conflicting claims with other members of the class; (2) the named representative must have a sufficient interest in the outcome to ensure vigorous adequacy; and (3) counsel for the named plaintiff must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously." *LHO*, 40 N.E.3d at 1273. The State challenges only the first two components.

Unlike the adequacy requirement, the typicality requirement is satisfied by one showing: that the representative plaintiffs' claims are neither in conflict with nor antagonistic to the class as a whole. *Id.* at 1272. Thus, the adequacy requirement essentially encompasses the typicality requirement. *Id.* at 1273.

The State contends that the named Plaintiffs are neither members of the certified class nor representative of the class because they may never become pregnant or need an abortion. For the same reasons, the State argues that the named Plaintiffs' claims are not typical of the class.

But these arguments just repeat the State's assertion that the Plaintiffs have not suffered any injury from the Abortion Law—that is, that their exercise of religion has not been substantially burdened by the Abortion Law due to their lack of pregnancy. As the merits of Plaintiffs' claims are presumed for purposes of class action certification, the availability of potential individualized defenses that would defeat a named Plaintiff's claim "is not a bar to class certification."

*Id.* at 1274. And even if Plaintiffs' claims later prove unmeritorious, "Trial Rule 23(D)(2) contemplates that a representative might have to be replaced, since it provides for the appointment by the trial court of new representatives should such appointment become necessary." *Id.*

[95] Plaintiffs have shown an adequate interest in the outcome to ensure vigorous advocacy. The named Plaintiffs all are claiming that the Abortion Law substantially burdens their exercise of their sincerely held religious beliefs and, as a result, they have restricted their efforts to become pregnant or otherwise expand their families. As the named Plaintiffs' claims are not antagonistic or conflicting with other members of the class and Plaintiffs have a sufficient interest in the outcome to ensure vigorous adequacy, the trial court did not abuse its discretion in finding the adequacy of representation and typicality requirements were met.

### iii. The Class Satisfies the Numerosity Requirement

[96] As to the numerosity requirement in Trial Rule 23(A)(1), the State argues that the evidence fails to reveal the number of people in the class. But "the numerosity prerequisite is not simply a test of numbers." *LHO*, 40 N.E.3d at 1270. Instead, the determination focuses on whether joinder would be impracticable, with consideration also of judicial economy and the ability of the class members to institute individual lawsuits. *Bolka*, 693 N.E.2d at 616. Joinder impracticability focuses on the characteristics of the class and not just the class representatives. *Matter of Tina T.*, 579 N.E.2d 48, 54-55 (Ind. 1991).

"A finding of numerosity may be supported by common sense assumptions." *Bolka*, 693 N.E.2d at 616. Here, Plaintiffs assert that common sense requires a finding that hundreds, if not thousands, of potential class members exist. The named Plaintiffs in the class alone comprise 49 people: the four Anonymous Plaintiffs and the 45 members of Hoosier Jews for Choice who allegedly are able to bear children, of whom at least 13% have already changed their sexual and reproductive behaviors solely to avoid becoming pregnant when an abortion required by their religious beliefs is unavailable. Appellees' Class Cert. Br., pp. 42-43. Further, Plaintiffs assert, and the State does not contest, that more than 26,000 Jewish persons, of which presumably a significant part are women, live in Indiana. Thus, the trial court acted within its discretion in finding the numerosity requirement met.

## C. The Class Satisfies Trial Rule 23(B)(2) Requirements

Trial Rule 23(B)(2) requires that Plaintiffs prove "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." T.R. 23(B)(2). The State claims this single injunction rule remains unmet because Plaintiffs have sought relief broader than RFRA allows.

In their Complaint, Plaintiffs request an injunction "enjoining defendants from taking any action that would prevent or otherwise interfere with the ability of the individual plaintiffs, the class members, and Hoosier Jews for Choice's members from obtaining abortions as directed by their sincere religious beliefs."

Appellants' Prelim. Inj. App. Vol. II, p. 85. The trial court appeared to acknowledge that the relief sought in the Complaint may be greater than that authorized by RFRA. *See generally* Indiana Code § 34-13-9-10(b)(1) (allowing "[d]eclaratory relief or an injunction or mandate that prevents, restrains, corrects, or abates the violation of this chapter"). But that is no obstacle because lesser relief—that is, a narrower permanent injunction—could be issued on the same Complaint if Plaintiffs ultimately prevail.

[100]   The State otherwise contends that no class-wide injunction is possible due to the diversity of religious views within the class, as well as the varying circumstances under which each faith mandates an abortion. But the State largely just repeats its claim that the class is too indefinite due to its members' varying faiths and beliefs—an argument we already have rejected.

[101]   The injunction sought by Plaintiffs, as they assert in their brief, is essentially a religious exemption to the Abortion Law. Thus, a single injunction seemingly could provide final, appropriate relief for the entire class consistent with RFRA upon proof that the Abortion Law violates Plaintiffs' rights under RFRA. This is no different from the injunctions approved in the servicemember's RFRA challenges to vaccine mandates. *See, e.g.*, *Doster*, 54 F.4th at 439-441 (rejecting claim that a single injunction would not afford relief to the class of servicemembers challenging vaccine mandates). Accordingly, we conclude that the trial court did not abuse its discretion in finding the Trial Rule 23(B)(2) requirements met.

## III. Preliminary Injunction

[102] Having determined the issues are justiciable and that class action certification was not an abuse of discretion, we turn to the central issue in this appeal: the propriety of the preliminary injunction. To obtain a preliminary injunction, the movant must show by a preponderance of the evidence that: (1) the movant has a reasonable likelihood of success on the merits; (2) the remedies at law are inadequate and irreparable harm will occur while the case is pending; (3) the threatened injury to the movant from a denial of the injunction outweighs the potential harm to the nonmovant from granting the injunction; and (4) the public interest would not be disserved by granting the injunction. *Thind v. Delaware Cnty.*, 207 N.E.3d 434, 439 (Ind. Ct. App. 2023); *Vikery v. Ardagh Glass, Inc.*, 85 N.E.3d 852, 859-60 (Ind. Ct. App. 2017).

[103] On appeal, the State contends Plaintiffs proved none of the preliminary injunction requirements and that the imposed injunction is overly broad. Appellate review of a preliminary injunction is "limited and deferential." *State v. Econ. Freedom Fund*, 959 N.E.2d 794, 801 (Ind. 2011). A trial court has discretion to enter a preliminary injunction and will be reversed only upon an abuse of that discretion. *Id.* at 799-800.

### A. Plaintiffs Have Shown a Reasonable Likelihood of Success

[104] In determining whether the trial court properly determined that Plaintiffs' RFRA claims have a reasonable likelihood of success, we must look to the elements of a RFRA claim and the evidence submitted. A party establishes a

prima facie case under Indiana's RFRA by showing the disputed governmental action substantially burdens the party's sincerely held religious belief. *Blattert v. State*, 190 N.E.3d 417, 421 (Ind. Ct. App. 2022).[14] Upon that showing, the burden shifts to the government to establish that a compelling governmental interest is "satisfied through application of the challenged law" to the claimant whose sincere exercise of religion is allegedly substantially burdened. *Id.* at 421 (quoting *Gonzales*, 546 U.S. at 420). "Further, the government must establish that the substantial burden is the least restrictive means of furthering that interest." *Id.*; *see also* Ind. Code § 34-13-9-8.

[105] If the government does not meet its burden, "the court . . . shall allow a defense against any party and shall grant appropriate relief against the governmental entity." Ind. Code § 34-13-9-10(a). RFRA allows for injunctive and declaratory relief as well as an award of all or part of the costs of litigation, including reasonable attorney fees, for violations. Ind. Code § 34-13-9-10(b)-(c).

[106] The State offers two reasons why Plaintiffs' RFRA claims are unlikely to succeed. First, the State asserts that Plaintiffs cannot prove that abortion is a "religious exercise" within the meaning of RFRA. Second, the State argues that the Abortion Law is the least restrictive means to achieve what the State views as its compelling interest in protecting the potential for life beginning at

[14] Federal RFRA claims require the same analysis. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705 (2014).

fertilization. We conclude that the trial court did not abuse its discretion in finding the Plaintiffs' RFRA claims are likely to succeed.

### i. Plaintiffs Have Shown Pregnancy Termination Qualifies as a Religious Exercise

[107] The parties do not quarrel over the definition of religious exercise—only whether abortion falls within that definition. "Exercise of religion," for purposes of the Indiana RFRA statute, "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." Ind. Code § 34-13-9-5. In the federal RFRA context, the U.S. Supreme Court has concluded that "the 'exercise of religion' involves 'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) (quoting *Emp. Div. Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 877 (1990)).[15]

[108] The State claims that abortion does not fall within that definition because pregnancy termination is just one of several ways Plaintiffs can prioritize their

---

[15] Although Indiana courts have not yet spoken on this issue, the federal courts treat federal RFRA as typically more plaintiff-friendly than the First Amendment's free exercise of religion clause. As then U.S. Court of Appeals for the Sixth Circuit Judge Sonia Sotomayor once explained: "[T]he Free Exercise Clause does not normally inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct . . . RFRA, in contrast, requires strict scrutiny of such laws where the incidental burden on religion is substantial." *Hankins v. Lyght*, 441 F.3d 96, 112 (6th Cir. 2006) (citations omitted) (Sotomayor, J., dissenting); *see also Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005) (noting that RFRA-type legislation provides protections beyond that guaranteed by the First Amendment); *Brzonkala v. Va. Polytech Inst. & State Univ.*, 169 F.3d 820, 881-82 (4th Cir. 1999) ("[RFRA] created a right of religious exercise that was more generous than that right protected by the Constitution . . . .").

own well-being over that of any potential life. The State thus analogizes abortion to seeing a therapist or nutritionist during pregnancy. The State concludes that abortion, as described by Plaintiffs, should be viewed simply as an enhancement to Plaintiffs' physical, emotional, or mental well-being, rather than a religious exercise.[16]

[109] The State also emphasizes that abortion should not qualify as a religious exercise because Plaintiffs, by their own admissions, will not necessarily seek to terminate every pregnancy. According to the State, abortion is not the type of mandatory ritual, such as eating only kosher food or Sabbath requirements for some, that has been found to be a religious exercise. *See, e.g.*, *Baranowski v. Hart*, 486 F.3d 112, 124 (5th Cir. 2007) (recognizing kosher prison diets and Jewish Sabbath and holy day services as religious exercise); *Adkins v. Kaspar*, 393 F.3d 559, 568 (5th Cir. 2004) (recognizing Sabbath and holy day gatherings as cognizable religious exercises).

[110] The procurement of health insurance is not a mandatory religious ritual, either, but it was at the core of a RFRA violation in *Burwell v. Hobby Lobby*. The *Burwell* Court ruled that federal regulations requiring employers to provide insurance

---

[16] To the extent the State is arguing that Plaintiffs' religious beliefs as to pregnancy termination are not sincere, the State has waived this argument through its acknowledged failure to raise the issue in the trial court. *See Blackwell v. Superior Safe Rooms LLC*, 174 N.E.3d 1082, 1091 (Ind. Ct. App. 2022) ("[I]t is generally true that a party waives an issue on appeal [by failing] to raise the argument in the trial court."). We find unpersuasive the State's claims that Plaintiffs' descriptions of their religious beliefs at the trial level were too sparse to allow such a challenge and that any evaluation of the sincerity of Plaintiffs' religious beliefs cannot be made until they are pregnant.

coverage for contraceptives—including some that prevented development of an already fertilized egg—substantially burdened the religious exercise of three closely held corporate employers who objected to abortions based on their sincere religious beliefs. 573 U.S. at 690-91, 736.

[111] Similarly, hair growth is not a religious ritual. Yet, courts have granted relief under RFRA to members of the Sikh faith, whose religion banned the cutting of a male's hair on his head and face, when they challenged military grooming policies mandating haircuts and facial shaving. *Singh v. Berger*, 56 F.4th 88, 110 (D.C. Cir. 2022) (granting preliminary injunction); *Singh v. McHugh*, 185 F.Supp.3d 201, 233 (D.C. Cir. 2016) (granting summary judgment to the RFRA plaintiff).

[112] Finally, avoiding vaccinations is not a religious ritual, but courts nevertheless have enjoined the military from enforcing vaccination mandates against servicemembers who challenged them under RFRA as a substantial burdening of their religious exercise. *See, e.g.*, *Doster*, 54 F.4th at 421 (finding plaintiff servicemembers "met their duty [under RFRA] to prove that the vaccine mandate imposed a substantial burden on their sincerely held religious beliefs"); *U.S. Navy SEALs*, 27 F.4th at 353 (denying partial stay pending appeal of preliminary injunction barring enforcement of the vaccine mandate); *Air Force Officer v. Austin*, 588 F.Supp.3d 1338, 1357 (M.D. Ga. 2022) (enjoining military vaccine mandate in RFRA action).

[113] Although *Burwell* and these military cases were decided under federal RFRA, both the federal version of RFRA and Indiana RFRA specify that "exercise of religion" does not require that the exercise be "compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A); Ind. Code § 34-13-9-5. This plain language, together with its interpretation in *Burwell* and the military cases, leads us to conclude that Plaintiffs' exercise of religion need not be ritualistic to be protected by RFRA.

[114] Support for this broad view of the free exercise of religion is prevalent. For instance, the U.S. Supreme Court has described "[t]he free exercise of religion" as "first and foremost, the right to believe and profess whatever religion doctrine one desires." *Smith*, 494 U.S. at 877. Indiana's religious liberty protections are similarly broad. *See* Ind. Const. art. 1, § 2 ("All people shall be secured in the natural right to worship ALMIGHTY GOD, according to the dictates of their consciences.") (emphasis in original); *id.* art. 1, § 3 ("No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience."); *id.* art. 1, § 4 ("No preference shall be given, by law, to any creed, religious society, or mode of worship; and no person shall be compelled to attend, erect, or support, any place of worship, or to maintain any ministry, against his consent.").

[115] In particular, "[t]he inclusion of the phrase 'in any case whatever' [in Article 1, Section 3] demonstrates the framers' and ratifiers' intent to provide unrestrained protection for the articulated values." *City Chapel Evangelical Free Inc. v. City of South Bend*, 744 N.E.2d 443, 445, 448 (Ind. 2001) (rejecting claim that the

exercise of religion as defined by the Indiana Constitution's religious liberties provisions is limited to the "personal devotional aspect" of worship).

[116] The State has provided little authority—and none that we find persuasive—to support the more restrictive view that religious exercise does not encompass the pregnancy terminations at issue here. Plaintiffs' claims, in fact, seem to be the other side of the *Burwell* coin. If a corporation can engage in a religious exercise by refusing to provide abortifacients—contraceptives that essentially abort a pregnancy after fertilization—it stands to reason that a pregnant person can engage in a religious exercise by pursuing an abortion. In both situations, the claimant is required to take or abstain from action that the claimant's sincere religious beliefs direct. And in both situations, the claimant's objection to the challenged law or regulation is rooted in the claimant's sincere religious beliefs.

[117] Again, "the 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts[.]" *Smith*, 494 U.S. at 877. Here, Plaintiffs have shown that the performance of a physical act—an abortion—is their religious exercise. Hoosiers have a long history of respecting religious diversity. *See generally City Chapel*, 744 N.E.2d at 448-49 (during a review of the history of religious liberties in Indiana, noting that "[t]he influx of settlers into Indiana reflected the whole range of religious belief and practice, and there was no religious unity from the beginning and denominations had no restraints" (internal quotations omitted)).

Though people of varying faiths may view reproductive choices differently, the right to free exercise of religion acknowledges that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others" to bear protection. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981)). We therefore conclude that the trial court did not err in finding that Plaintiffs' abortion when directed by their sincere religious beliefs is their exercise of religion.[17]

## ii. The State Has Not Established a Compelling Interest or that the Abortion Law is the Least Restrictive Means of Furthering that Compelling Interest

In its next attack on the trial court's judgment, the State asserts that the Abortion Law is the least restrictive means of achieving the State's alleged compelling interest in protecting the potential for life. The trial court found that the State had not established a compelling interest in enforcing the Abortion Law against Plaintiffs. Appellants' Prelim. Inj. App. Vol. II, p. 52. The court also found that, even if a compelling interest existed, the State had not established that the Abortion Law was the least restrictive means of furthering the State's compelling interest. *Id.* We agree with both conclusions.

---

[17] The State does not appear to dispute that if pregnancy termination is an exercise of religion by Plaintiffs, the Abortion Law substantially burdens that exercise.

## a. The State Has Not Shown a Compelling Interest

[120] The State asserts a recognized compelling interest in protecting a potential human life beginning at fertilization. Its argument is based almost entirely on the Indiana Supreme Court's decision in *Cheaney v. State*, 285 N.E.2d 265, 270 (Ind. 1972).

[121] In *Cheaney*, the Court recognized that the State had a "valid and compelling" interest in "a living being and potential human life" from "the moment of conception." 285 N.E.2d at 270. But *Cheaney* involved a federal constitutional challenge to an Indiana criminal statute outlawing abortion, rather than a claim brought under state law. The *Cheaney* decision also predates *Roe v. Wade*, 410 U.S. at 163-64, which recognized that the State has no compelling interest in potential life during the first trimester of pregnancy. Decrying the analysis in *Roe*—including its ruling that the State had no compelling interest until a viable fetus exists—the U.S. Supreme Court ruled in *Dobbs* that the federal constitution "does not confer a right to abortion." 597 U.S. at 292. The *Dobbs* Court left to the states the regulation or prohibition of abortion, which presumably entails determinations of the State's interest in potential life. *Id.* at 302.

[122] The Indiana Supreme Court's recent decision in *Planned Parenthood* did not fully explain its post-*Dobbs* view of the State's interest under the Indiana Constitution. The plaintiffs in *Planned Parenthood* conceded that the State had a "legitimate" interest in "protecting prenatal life." 211 N.E.3d at 979. But

neither the *Planned Parenthood* plaintiffs nor the Court pinpointed exactly when that interest begins or the full extent of the State's interest in zygotes, embryos, and fetuses.

[123] By ruling that the Indiana Constitution "protects a woman's right to an abortion that is necessary to protect her life or to protect her from a serious health risk," the *Planned Parenthood* Court essentially established one general circumstance in which a woman's interest in an abortion outweighs any interest by the State in protecting the potential of life. *Id.* at 962. But the Court did not specify when the State's interest outweighs a woman's competing interest in terminating a pregnancy. According to the Court, "Hoosiers have generally delegated this responsibility to the General Assembly." *Id.* at 980.

[124] The General Assembly has not fully drawn these interests. But its preliminary sketches indicate the State lacks a compelling interest in potential life from the moment an egg is fertilized. For instance, the General Assembly has declined to explicitly define human beings to include zygotes, embryos, or all fetuses. *See* Ind. Code § 35-31.5-2-160 (defining "human being" as "an individual who has been born and is alive"); Ind. Code § 35-42-1-1 (differentiating between the killing of a fetus and the killing of a "human being"); Ind. Code § 34-23-2-1(b) (defining "child" for purposes of an action for wrongful death or injury to include "a fetus that has attained viability"). The Abortion Law also does not designate the exact point during pregnancy when the State's interest in a zygote, embryo, or fetus becomes compelling.

[125] But we need look no further than the language of the Abortion Law to determine that the General Assembly does not view the State's compelling interest as beginning at fertilization. The Abortion Law exempts in vitro fertilization procedures from its scope, although there is the potential for life that might be destroyed in the process of this procedure. Ind. Code § 16-34-1-0.5. That broad exemption suggests any compelling interest by the State is absent at fertilization.

[126] Beyond that, the Abortion Law expressly permits abortions at all stages of gestation provided certain express requirements are met. Specifically, assuming all other statutory requirements are met:

- Indiana Code § 16-34-2-1(a)(1) permits abortion "before the earlier of viability of the fetus or twenty (20) weeks of postfertilization age of the fetus if":

  - "reasonable medical judgment dictates that performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life" or

  - "the fetus is diagnosed with a lethal fetal anomaly."

  - But not by means of an abortion-inducing drug "after eight (8) weeks of postfertilization age."

- Indiana Code § 16-34-2-1(a)(2) permits abortion "during the first ten (10) weeks of postfertilization age of the fetus, if . . . the pregnancy is a result of rape or incest."

- And Indiana Code § 16-34-2-1(a)(3) permits abortion "at the earlier of viability of the fetus or twenty (20) weeks of

postfertilization age and any time after, for reasons based upon the professional, medical judgment of the pregnant woman's physician if . . . performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life."

[127] We conclude for several reasons that the State has not demonstrated that a compelling state interest—particularly one that begins at fertilization—is "satisfied through application of the challenged law" to Plaintiffs. *Blattert*, 190 N.E.3d at 421 (quoting *Gonzales,* 546 U.S. at 420). First, the State relies solely on *Cheaney* to its detriment. Decided a half century ago, *Cheaney*'s compelling interest statement was made in response to a claim that an Indiana statute criminalizing abortion violated the Ninth Amendment to the United States Constitution. 285 N.E.2d at 266-70. The appellant had argued that the Ninth Amendment "provides a fundamental right to privacy which includes the woman's right to decide whether to bear an unquickened fetus." *Id.* at 266. A similar privacy argument ultimately prevailed on the federal level the next year in *Roe,* 410 U.S. at 153-54. But the concept of a federal privacy-based right to an abortion under the United States Constitution was soundly rejected by *Dobbs*, 597 U.S. at 273, 292. Therefore, *Cheaney's* compelling interest holding was made in the context of a privacy claim that is no longer cognizable.

[128] Moreover, in the 52 years since *Cheaney* was decided, significant medical advances have occurred, and state and federal courts have developed extensive

precedent in a litany of various abortion-related disputes.[18] Although *Cheaney* has never been overruled by the Indiana Supreme Court, the Court also has never directly applied *Cheaney*'s statement that the State has a compelling interest in potential life from fertilization. *See Humphreys v. Clinic for Women, Inc.*, 796 N.E.2d 247, 255 (Ind. 2003) (noting State's claim under *Cheaney* of a compelling interest from "conception" but only recognizing, without reference to *Cheaney*, the State's "interest in protecting fetal life."). In any case, *Dobbs* made clear that it was "return[ing] the issue of abortion to" state legislatures and that "courts do not substitute their social and economic beliefs for the judgment of legislative bodies." 597 U.S. at 289 (quoting *Ferguson v. Skrupa*, 372 U.S. 726, 729-30 (1963)).

[129]    Our Supreme Court's treatment of *Cheaney* in *Planned Parenthood* does not change our conclusion that *Cheaney* is distinguishable from the present case. As *Planned Parenthood* involved a facial challenge to the Abortion Law that did not require compelling interest analysis, the Court never mentioned *Cheaney's* finding "that a State interest in what is, at the very least, from the moment of conception a living being and potential human life, is both valid and compelling." *Cheaney*, 285 N.E.2d at 270.

---

[18] Since *Cheaney* was handed down, the word "abortion" has appeared in more than 180 Indiana appellate decisions, none of which have directly applied *Cheaney's* statement that the State has a compelling interest in potential life that begins at "conception." *Cheaney*, 285 N.E.2d at 270.

Given *Cheaney's* questionable applicability here and the Abortion Law's plain language permitting abortions at various stages of pregnancy, we conclude that the State has not shown a compelling interest in the protection of potential life beginning at fertilization.

## b. Even if the State Established a Compelling Interest, It Failed to Show that the Abortion Law Was the Least Restrictive Means of Furthering that Interest

The State also challenges the trial court's finding that the Abortion Law is not the least restrictive means of furthering the State's alleged compelling interest. "In other words, if a less restrictive alternative would serve the governmental purpose, a legislature must use that alternative." *State v. Katz*, 179 N.E.3d 431, 458-59 (Ind. 2022).

Least restrictive means analysis requires a comparison of the State's preferred means of protecting potential life—the Abortion Law—to other possible options. *See Blattert*, 190 N.E.3d at 423. The State has the burden of addressing each alternative of which it becomes aware during the litigation. *Id.* "[T]he State's 'burden is two-fold: it must support its choice of regulation, and it must refute the alternative schemes offered by the challenger.'" *Id.* (quoting *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011)).

Plaintiffs did not expressly provide any alternative schemes for furthering the State's alleged compelling interest of protecting the zygote, embryo, or fetus. Instead, Plaintiffs contend that the Abortion Law is "underinclusive" because it

exempts some abortions from criminal prosecution on secular grounds but includes no religious exceptions. Appellees' Prelim. Inj. Br., pp. 52-54.

[134] The means used by the legislature to further its compelling interest must be neither seriously underinclusive nor seriously overinclusive. *Katz*, 179 N.E.3d at 459. A law is underinclusive when it provides exceptions for secular conduct that contravene the State's asserted compelling interest to a similar or greater degree than religious conduct not subject to an exception. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). Underinclusiveness may "reveal that a law does not actually advance a compelling interest." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015); *see also Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 547 (ruling that a law cannot be viewed as protecting an interest "of the highest order" if it allows "appreciable damage to that supposedly vital interest unprohibited") (citations omitted). If a less restrictive method that would serve the government's interest exists, the legislature must use that alternative. *Katz,* 179 N.E.3d at 458-59.

[135] The Abortion Law allows a conditional right to abortions "to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life." Ind. Code §§ 16-34-2-1(a)(1)(A)(i), (3)(A). This amounts to an exception to the Abortion Law's prohibitions based on a prioritization of the pregnant woman's health over the survival of the zygote, embryo, or fetus. But that is the same sort of prioritization reflected in the Plaintiffs' religious beliefs, albeit on a different scale.

[136] Plaintiffs' religious beliefs direct them to terminate their pregnancy "if their health or wellbeing—physical, mental, or emotional—were endangered by a pregnancy, pregnancy-related condition, or fetal abnormality." Appellees' Prelim. Inj. Br., p. 18. In other words, in accordance with Plaintiffs' religious beliefs, the pregnant woman's health must have precedence, with an abortion available even if, contrary to the Abortion Law: (1) the pregnancy is not life-threatening; (2) the pregnancy does not present a serious health risk as that term is used in the Abortion Law; or (3) the fetal abnormality is not lethal within the meaning of the Abortion Law.

[137] Thus, the broader religious exemption that Plaintiffs effectively seek has the same foundation as the narrower exceptions already existing in the Abortion Law: all are based on the interests of the mother outweighing the interests of the zygote, embryo, or fetus. The religious exemption that Plaintiffs seek, based on their sincere religious beliefs, merely expands the circumstances in which the pregnant woman's health dictates an abortion.

[138] RFRA requires the Government to show that the claimed compelling interest is satisfied through application of the challenged law to the particular claimants whose sincere exercise of religion is being substantially burdened. *See Gonzales*, 546 U.S. at 430-31. That alone is a high bar. *U.S. Navy SEALs,* 27 F.4th at 350. But this already challenging standard is heightened further when, as here, the contested law already provides an exception for a particular group. *Id.*

[139] In determining whether the State has met this heavy burden, we must "look[ ] beyond broadly formulated interests" and "scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales,* 546 U.S. at 431. The State alleges that granting a religious exemption to Plaintiffs will cause loss of potential life. But the existing exceptions in the Abortion Law also result in the loss of that potential for life. Thus, the Abortion Law is underinclusive.

[140] If a policy is underinclusive, the State must adequately explain its differential treatment to avoid the conclusion that the law does not actually serve a compelling interest. *Ware v. La. Dep't of Corr.,* 866 F.3d 263, 269 (5th Cir. 2017). As the State cannot rely on broadly formulated interests, it must show distinct harm from granting specific exemptions to particular religious claimants. *Hobby Lobby*, 573 U.S. at 726-27; *Gonzales*, 546 U.S. at 431 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 236 (1972)).

[141] The State's explanation does not meet this standard. The State has not shown that its claimed compelling interest in protecting the potential for life is satisfied by denying Plaintiffs' religious-based exception that prioritizes a mother's health over potential life, given that other exceptions are allowed based on the same prioritization—that is, the exceptions applicable when the pregnancy poses a "serious health risk" or termination would "save the pregnant woman's life." Ind. Code §§ 16-34-2-1(a)(1)(A)(i), (a)(3)(A); *see, e.g.*, *Holt v. Hobbs*, 574 U.S. 352, 368-70 (2015) (finding underinclusiveness when prison's grooming policy did not allow prisoners to grow half-inch beard for religious reasons but

authorized prisoners with a dermatological condition to grow quarter-inch beards); *U.S. Navy SEALs*, 27 F.4th at 352 (finding COVID-19 vaccination mandates to be underinclusive when exemptions were given to 17 other military members but denied to plaintiffs seeking religious accommodations).

[142] This weakness in the State's argument is even more apparent when the Abortion Law's other exceptions are considered. First, the Abortion Law does not apply to in vitro fertilization. *See* Ind. Code § 16-34-1-0.5. That suggests the Abortion Law does not criminalize zygote destruction, although the State is claiming a compelling interest that begins the moment an egg is fertilized.

[143] The Abortion Law also allows abortions when the pregnancy resulted from rape or incest or when the fetus has been diagnosed with a lethal fetal anomaly so long as other statutory conditions are met. Ind. Code §§ 16-34-2-1(a)(1)(A)(ii), (2)(A), (3)(A). The State does not explain why a victim of rape or incest is entitled to an abortion, but women whose sincere religious beliefs direct an abortion are not. The State also does not explain how allowing an abortion of a "fetus diagnosed with a lethal fetal anomaly"—as is conditionally permitted by the Abortion Law—advances the State's alleged compelling interest in protecting potential life. Ind. Code § 34-16-2-1(a)(1)(A)(ii).

[144] The rape/incest exception in the Abortion Law—while seemingly favoring the pregnant woman's interest over that of the zygote, embryo, or fetus—is based on a tragic circumstance rather than risks to the mother's physical health. For instance, the Abortion Law does not require a victim of rape or incest to obtain

a doctor's certification that "performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life," as is required under other abortion exceptions within the Abortion Law. *See* Ind. Code §§ 16-34-2-1(a)(1)(A), (a)(3)(A). Given the Abortion Law's underinclusiveness and the State's lack of accompanying justification, we conclude that the trial court correctly found the State did not satisfy the least restrictive means test.

## B. Plaintiffs Must Prove Irreparable Harm, But They Met That Burden

[145] The State also claims that Plaintiffs are not entitled to a preliminary injunction because they did not show they would be irreparably harmed absent the injunction. Although the trial court found that Plaintiffs satisfied all elements for a preliminary injunction, it alternatively determined that proof of the elements of irreparable harm and a balancing of harm in Plaintiffs' favor were unnecessary. This alternative ruling was based on precedent establishing that when the acts sought to be enjoined are unlawful, the petitioner need not show irreparable harm or a balancing of harm in their favor. *See, e.g.*, *Doe 1 v. Boone Cnty. Prosecutor*, 85 N.E.3d 902, 911 (Ind. Ct. App. 2017).

[146] In finding proof of irreparable harm unnecessary, the trial court relied on *Short on Cash.Net of New Castle, Inc. v. Dep't of Fin. Insts.*, 811 N.E.2d 819, 823 (Ind. Ct. App. 2004), in which this Court ruled:

> [W]here the action to be enjoined is unlawful, the unlawful act constitutes *per se* "irreparable harm" for purposes of the

preliminary injunction analysis. When the *per se* rule is invoked, the trial court has determined the defendant's actions have violated a statute and, thus, that the public interest is so great that the injunction should issue regardless of whether the plaintiff has actually incurred irreparable harm or whether the plaintiff will suffer greater injury than the defendant. Accordingly, invocation of the *per se* rule is only proper when it is clear that a statute has been violated.

(internal citations omitted).

[147] The State asks this Court to reject this *per se* standard, noting that our Supreme Court has limited it to cases, unlike the present litigation, in which the violation of a statute is clear and uncontested. *See, e.g.*, *Ind. Fam. & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 162 (Ind. 2002) (finding *per se* standard inapplicable because illegality of challenged action was not clear). *Walgreen* predated *Short on Cash* by two years. *Short on Cash* cited *Walgreen* twice on other points of law but never mentioned the case's limitations on the *per se* standard. *Short on Cash*, 811 N.E.2d at 822-23.

[148] Some panels of this Court subsequently cited *Short on Cash* with approval without mentioning *Walgreen* or its limitations on the *per se* standard. *See, e.g.*, *Planned Parenthood of Ind. v. Carter*, 854 N.E.2d 853, 863-64 (Ind. Ct. App. 2006); *Clay Twp. of Hamilton Cnty. ex rel. Hagan v. Clay Reg'l Waste Dist.,* 838 N.E.2d 1054, 1063 (Ind. Ct. App. 2005). Our Supreme Court then reentered the debate in *Leone v. Comm'r, Ind. Bureau of Motor Vehicles*, 933 N.E.2d 1244, 148 n.6 (Ind. 2010).

[149] The *Leone* Court observed that the rule in *Short on Cash* "may or may not reflect sound injunction law." *Id.* But it proceeded to find, consistent with *Walgreen*, that the relaxed standard did not apply because the violation of law in *Leone* was not clear and uncontested. *Id.*; *see also State v. Econ. Freedom Fund*, 959 N.E.2d 794, 804 (Ind. 2011) (applying the *per se* standard where parties agreed that statute at issue was violated).

[150] Given our Supreme Court's decision in *Leone*, the *per se* standard does not apply here because the alleged violation of law—that is, contravention of RFRA through application of the Abortion Law to Plaintiffs—is vigorously contested. Accordingly, we agree with the State that the trial court erred in finding proof of irreparable harm was not required.

[151] But the trial court's alternative ruling—that Plaintiffs adequately showed irreparable harm—was justified by the evidence. The trial court found that absent a preliminary injunction, Plaintiffs would be irreparably harmed by the loss of their religious freedoms guaranteed by RFRA. A loss of First Amendment freedoms, which include the right to free exercise of religion, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

[152] In addition, the lack of access to an abortion before *Dobbs* was found to constitute irreparable harm justifying a preliminary injunction. *J.D. v. Azar*, 925 F.3d 1291, 1338 (D.C. Cir. 2019) (concluding that irreparable harm arose from the lack of access by certain minors to pre-viability abortions). Even a

requirement that abortion providers advise patients of certain statutory abortion restrictions was found, pre-*Dobbs*, to constitute irreparable harm for purposes of a preliminary injunction. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r*, 194 F.Supp.3d 818, 834-35 (S.D. Ind. 2016) (issuing preliminary injunction in action challenging, among other things, the constitutionality of an Indiana abortion statute under the First Amendment's prohibition against compelled speech).

Since *Dobbs*, some courts have continued to enter preliminary injunctions after finding irreparable harm arising from statutes that had the effect of limiting abortion access. *Fund Texas Choice v. Paxton*, 658 F.Supp.3d 377, 414 (W.D. Tex. 2023) ("Because Texas's abortion laws restrict the ability to speak openly about abortion support and threaten to force the organizations to close entirely," the plaintiffs that facilitated out-of-state abortions "are suffering an ongoing and irreparable harm" and were entitled to a preliminary injunction); *Matsumoto v. Labrador*, No. 1:23-cv-00323-DKG, 2023 WL 7388852 (D. Idaho November 8, 2023) (granting preliminary injunction barring enforcement of Idaho statute criminalizing the facilitation of abortions to minors without their parents' consent against plaintiffs, who desired to continue assisting pregnant people, including minors, with accessing legal abortion care); *Okla. Call for Reprod. Justice v. Drummond*, 543 P.3d 110 (Okla. 2023) (reversing denial of temporary injunction barring enforcement of statutes that limited a woman's state constitutional right to an abortion to preserve her own life).

The trial court did not abuse its discretion in finding Plaintiffs would suffer irreparable harm absent the preliminary injunction.

## C. The Trial Court Did Not Err in Finding the Balancing of Harms and Public Interest Weighed in Plaintiffs' Favor

The State claims the balance of harms and public interest favors denial of the preliminary injunction, given that abortion is an irreversible procedure. According to the State, Plaintiffs' harms from "changes to their contraceptive and sexual practices do not outweigh the grave consequences of killing an unborn child." Appellants' Prelim. Inj. Br., p. 60. The State also notes that if Plaintiffs' future pregnancies during this litigation threaten their lives or pose a serious health risk, they could terminate their pregnancies legally under the Abortion Law. *See* Ind. Code §§ 16-34-2-1(a)(1), (3).

Relying on a federal appellate decision, the trial court found that because Plaintiffs showed they are likely to succeed on the merits, entry of a preliminary injunction would not create any substantial harm to others. *See Déjà Vu of Nashville, Inc., v. Metro Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) (ruling that proof of likelihood of success on a First Amendment claim often determines a preliminary injunction challenge, given that even a minimal infringement of First Amendment freedoms constitutes irreparable injury, no substantial harm to others occurs in the enjoinment of such a violation, and preventing such violations is always in the public interest), *cert. denied*, 535 U.S.1073 (2002).

[157] Without a preliminary injunction, Plaintiffs will suffer the loss of their right to exercise their sincere religious beliefs by obtaining an abortion when directed by their religion and prohibited by the Abortion Law. They also have shown their sexual and reproductive lives will continue to be restricted absent the injunction and as a result of the Abortion Law. The opposing harm with an injunction is the loss of the potential for life represented by a zygote, embryo or fetus that will no longer exist if a Plaintiff terminates the pregnancy outside the parameters of the Abortion Law. Thus, Plaintiffs have shown existing harm in the form of reproductive and sexual restrictions whereas the harm to the public is conditional (that is, based on the prospect of pregnancy that may eventually result in a live birth). The trial court did not abuse its discretion in balancing the harms in favor of Plaintiffs.

[158] We also find no abuse of discretion in the trial court's finding that the public interest favored entry of the preliminary injunction. As the trial court determined, statutory violations are against public interest and may support issuance of an injunction. *See Short on Cash*, 811 N.E.2d at 823. And in any case, injunctions protecting First Amendment freedoms are always in the public interest. *U.S. Navy SEALs*, 27 F.4th at 353 (citing *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013)).

## IV.  Breadth of Injunction

[159] Given our finding that the trial court did not abuse its discretion in finding Plaintiffs were entitled to a preliminary injunction, the only issue remaining is the State's claim that the injunction exceeds the trial court's remedial authority.

The trial court enjoined "the Defendants and their officers from enforcing the provisions of [the Abortion Law] against Plaintiffs." Appellants' Prelim. Inj. App. Vol. II, p. 59. The State argues that the injunction lacks the specificity required by Indiana Trial Rule 65(D), which requires that the order specify and "describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." T.R. 65(D).

[160] The State asserts the injunction is so broad that it enjoins future government action that may not violate RFRA. RFRA authorizes relief that "prevents, restrains, corrects, or abates the [RFRA] violation." Ind. Code § 34-13-9-10(b)(1). For instance, the injunction would bar the State from preventing Plaintiffs from obtaining abortions that are outlawed by the Abortion Law but that are not directed by Plaintiffs' sincere religious beliefs.

[161] Plaintiffs' response is that the preliminary injunction should be interpreted more narrowly because Plaintiffs never sought such broad relief. But Plaintiffs do little else to dispute that the language is as broad as the State suggests. Plaintiffs instead suggest that the trial court simply can modify the language in the preliminary injunction if the need arises.

[162] We view the more reasoned approach to be remand for entry of a more narrowly tailored preliminary injunction. *See, e.g.*, *AGS Cap. Corp. v. Prod. Action Int'l, LLC*, 884 N.E.2d 294, 315 (Ind. Ct. App. 2008) (finding that "[a] preliminary injunction is to be narrowly tailored" and reversing in part and remanding where parts of preliminary injunction were overly broad).

[163] We therefore affirm the trial court's finding that Plaintiffs are entitled to a preliminary injunction and remand for further proceedings consistent with this opinion.

May, J., concurs.
Bailey, J., concurs with a separate opinion.

ATTORNEYS FOR APPELLANTS

Theodore E. Rokita
Attorney General of Indiana

James A. Barta
Solicitor General

Katelyn E. Doering
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
THE BECKET FUND FOR RELIGIOUS LIBERTY

Paul J. Carroll
Wooton Hoy, LLC
Greenfield, Indiana

Lori H. Windham
Adèle A. Keim
Rebekah P. Ricketts
Washington, D.C.

ATTORNEYS FOR APPELLEES

Kenneth J. Falk
Stevie J. Pactor
Gavin M. Rose
ACLU of Indiana
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
THE JEWISH COALITION FOR RELIGIOUS LIBERTY

Zechariah D. Yoder
Adler Attorneys
Noblesville, Indiana

Joshua M. Blackman
Josh Blackman LLC
Houston, Texas

Howard Slugh
The Jewish Coalition for Religious Liberty
Washington, D.C.

ATTORNEY FOR AMICUS CURIAE
NATIONAL COUNCIL OF JEWISH WOMEN; NATIONAL COUNCIL OF JEWISH
WOMEN INDIANAPOLIS SECTION; RECONSTRUCTIONIST RABBINICAL
ASSOCIATION; ZIONESS; T'RUAH; KESHET; THE RABBINICAL ASSEMBLY;
MOVING TRADITIONS; AVODAH; MUSLIMS FOR PROGRESSIVE VALUES;
RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; SADHANA: COALITION
OF PROGRESSIVE HINDUS; HINDUS FOR HUMAN RIGHTS; AND CATHOLICS FOR
CHOICE

Jeffrey A. Macey
Macey Swanson LLP
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
HISTORIANS OF RELIGION, REPRODUCTION, AND THE LAW

William R. Groth
Bowman & Vlink, LLC
Indianapolis, Indiana

Mark W. Sniderman
Sniderman Law
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
CERTAIN SCHOLARS OF JEWISH STUDIES AND RELIGION

Richard E. Shevitz
Arend J. Abel
Natalie A. Lyons
Cohen & Malad, LLP
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE; ADL (ANTI-DEFAMATION LEAGUE); BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE; CENTRAL CONFERENCE OF AMERICAN RABBIS; GLOBAL JUSTICE INSTITUTE, METROPOLITAN COMMUNITY CHURCHES; HINDU AMERICAN FOUNDATION; INTERFAITH ALLIANCE FOUNDATION; MEN OF REFORM JUDAISM: METHODIST FEDERATION FOR SOCIAL ACTION; RECONSTRUCTIONIST RABBINICAL ASSOCIATION; RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; THE SIKH COALITION; UNION FOR REFORM JUDAISM; UNITARIAN UNIVERSALIST ASSOCIATION; AND WOMEN OF REFORM JUDAISM

Richard B. Katskee
Alex J. Luchenitser
Kalli A. Joslin
Americans United for Separation of Church and State
Washington, D.C.

Katherine Lacy Crosby
Tachau Meek PLC
Louisville, Kentucky

**Bailey, Judge, concurring.**

[164] "All people shall be secured in the natural right to worship ALMIGHTY GOD, according to the dictates of their own consciences." IN Const. Art. 1, § 2 (emphasis in original.) "No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience." IN Const. Art. 1, § 3. Accordingly, our Indiana Supreme Court has stated:

> From the literal text of Sections 2 and 3, the discussions at the Constitutional Convention, and the surrounding circumstances, we conclude that the framers and ratifiers of the Indiana Constitution's religious liberty clauses did not intend to afford only narrow protection for a person's internal thoughts and private practices of religion and conscience.

*City Chapel Evangelical Free, Inc. v. City of South Bend ex rel. Dep't of Redevelopment*, 744 N.E.2d 443, 450 (Ind. 2001). In accordance with abundant religious liberty and the recognition of a pluralistic society, our Constitution further provides: "No preference shall be given, by law, to any creed, religious society, or mode of worship[.]" IN Const. Art. 1, § 4.

[165] Yet in this post-*Dobbs*[19] world, our Legislature has done just that – preferred one creed over another. Based upon the premise that the State has a compelling interest in the outcome of a woman's pregnancy arising at the very moment of

---

[19] *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

conception,[20] there is a codification of when life begins, something intensely debated among adherents to various religions.[21] Moreover, if I glean anything from the broad range of views on this concept of ensoulment contained in the amicus briefs, it is that there is truly no consensus about when ensoulment occurs. Rather, it is to be determined as an article of faith unique to each particular religious society. And despite the diversity of viewpoints on the concept of ensoulment, there is no claim among the amici that the termination of a pregnancy extinguishes the soul.

[166] Given the breadth of religious diversity and sects among Hoosiers, I am not surprised that the language employed by the framers of our Indiana Constitution suggests that an individual facing circumstances attendant to pregnancy, experienced uniquely by that individual,[22] should resort to her own conscience and her own creed without undue state interference. Indeed, where theologians cannot agree, legislators are ill-equipped to define when life begins.

---

[20] As noted by the majority, the Abortion Law does not criminalize destruction of zygotes produced in anticipation of in vitro implantation.

[21] I acknowledge that, in asserting its interest, the State no longer need be bound by the trimester formulation of *Roe v. Wade*, 410 U.S. 113 (1973). Nor is there any compulsion to follow the "undue burden" test of *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 873 (1992) (which found the trimester "formulation ... misconceives the nature of the pregnant woman's interest" and "it undervalues the State's interest in potential life" and held that women had a federal constitutional right to abortion without undue interference from states before viability, but states could prohibit abortions after viability (so long as there was an exception for pregnancies which endangered a woman's health or life)).

[22] Because of biological realities independent of theological concepts, the physical and emotional burden of pregnancy falls squarely upon the female. And although the hope is that the psychological, financial, familial, and legal consequences will be shared, too many times these consequences fall disproportionately upon the pregnant woman or girl.

As the majority notes, our legislature has not – to date – enacted wholly consistent statutory schemes conferring the rights of a human being upon zygotes, embryos, and fetuses.

[167] In a more perfect world, each pregnant woman in evaluating her options would have no burden beyond examining her individual conscience, counseling with her spiritual advisor, and consulting with her medical provider.[23]  But a perfect world this is not and resulting pregnancy is not always a simple free will contract or agreement.  Despite untiring and commendable legislative efforts, we do not live in a society in which we can confidently say that women and girls of childbearing age live free from physical and psychological domestic abuse, rape, human trafficking,[24] incest, and economic disparity.  And a woman who has become pregnant of her own free will may subsequently be confronted

---

[23] I must acknowledge that the Abortion Law as it currently exists in Indiana has a chilling effect upon the scope of medical advice that may lawfully be conveyed.  Indeed, the plaintiffs in this matter, who have been successful in their pursuit of an injunction, have secured no corollary means by which a medical practitioner could escape legal liability for a procedure performed in contravention of the Abortion Law.

[24] Our criminal code defines human trafficking to include multiple acts, such as sex trafficking, forced marriage, and labor trafficking.  *See* Ind. Code § 35-42-3.5-1 (providing that forcible, fraudulent, or coercive recruitment, harboring, or transport of a person to provide labor or services is the promotion of human labor trafficking, a Level 4 felony); I.C. § 35-42-3.5-1.1 (defining promotion of human sexual trafficking, a Level 4 felony, to include recruitment and other forceful, fraudulent, or coercive acts to cause a person to marry, engage in prostitution, or participate in sexual conduct); I.C. § 35-42-3.5-1.2(a), (providing that a person who knowingly or intentionally recruits, entices, harbors, or transports a child less than eighteen years of age with the intent of causing the child to engage in prostitution, juvenile prostitution, or a performance or incident that includes sexual conduct in violation of I.C. 35-42-4-4(b) or I.C. 35-42-4-4(c) (child exploitation) commits promotion of child sexual trafficking, a Level 3 felony); I.C. § 35-42-3.5-1.3 (defining child sexual trafficking, a Level 2 felony, as the knowing or intentional sale or transfer of custody of a child for the purpose of prostitution, juvenile prostitution, or participation in sexual conduct); and I.C. § 35-42-3.5-1.4(a) (providing that "A person who knowingly or intentionally:  (1) pays, or offers or agrees to pay, money or other property; or (2) offers a benefit; to or for a human trafficking victim with the specific intent to induce or obtain the product or act for which the human trafficking victim was trafficked commits human trafficking, a Level 4 felony.")

with adverse physical and mental conditions. In the face of monetary scarcity or physical limitations, she may be forced to allocate limited monetary or caregiving resources among the unborn and children already in existence, perhaps including those with special needs. She may lose her support system or employment. She may find that she needs medical treatment or pharmaceutical intervention incompatible with fetal life. She may discover that her pregnancy will not result in a live birth. Legislators, an overwhelming majority of whom have not experienced childbirth, nevertheless dictate that virtually all pregnancies in this State must proceed to birth notwithstanding the onerous burden upon women and girls. They have done so not based upon science or viability but upon a blanket assertion that they are the protectors of "life" from the moment of conception. In my view, this is an adoption of a religious viewpoint held by some, but certainly not all, Hoosiers. The least that can be expected is that the remaining Hoosiers of child bearing ability will be given the opportunity to act in accordance with their own consciences and religious creeds.

[168] For these reasons, I concur with the majority opinion.